Dr. Joseph T. SEDMAK, III and Linda
Sedmak, Plaintiffs-Respondents,

v.

CHARLIE'S CHEVROLET, INC., a
Missouri Corporation,
Defendant-Appellant.

No. 41378.

Missouri Court of Appeals,
Eastern District,
Division Four.

June 16, 1981.

Kappel, Neill & Staed, C. William Portell, Jr., St. Louis, for defendant-appellant.

Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown by William L. Davis, St. Louis, for plaintiffs-respondents.

SATZ, Judge.

This is an appeal from a decree of specific performance. We affirm.

In their petition, plaintiffs, Dr. and Mrs. Sedmak (Sedmaks), alleged they entered into a contract with defendant, Charlie's Chevrolet, Inc. (Charlie's), to purchase a Corvette automobile for approximately $15,000.00. The Corvette was one of a limited number manufactured to commemorate the selection of the Corvette as the Pace Car for the Indianapolis 500. Charlie's breached the contract, the Sedmaks alleged, when, after the automobile was delivered, an agent for Charlie's told the Sedmaks they could not purchase the automobile for $15,000.00 but would have to bid on it.

The trial court found the parties entered into an oral contract and also found the contract was excepted from the Statute of Frauds. The court then ordered Charlie's to make the automobile "available for delivery" to the Sedmaks.

Charlie's raises three points on appeal: (1) the existence of an oral contract is not supported by the credible evidence; (2) if an oral contract exists, it is unenforceable because of the Statute of Frauds; and (3) specific performance is an improper remedy because the Sedmaks did not show their legal remedies were inadequate.

This was a court-tried case. The scope of our review is defined by the well-known principles set out in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). We sustain the judgment of the trial court unless the judgment is not supported by substantial evidence, unless it is against the weight of the evidence or unless it erroneously declares or applies the law. *Id.* at 32. In conducting our review, we do not judge the credibility of witnesses. That task quite properly rests with the trial court.

Rule 73.01(c)(2); *Kim Mfg., Inc. v. Superior Metal Treating, Inc.*, 537 S.W.2d 424, 428 (Mo.App.1976).

In light of these principles, the record reflects the Sedmaks to be automobile enthusiasts, who, at the time of trial, owned six Corvettes. In July, 1977, "Vette Vues," a Corvette fancier's magazine to which Dr. Sedmak subscribed, published an article announcing Chevrolet's tentative plans to manufacture a limited edition of the Corvette. The limited edition of approximately 6,000 automobiles was to commemorate the selection of the Corvette as the Indianapolis 500 Pace Car. The Sedmaks were interested in acquiring one of these Pace Cars to add to their Corvette collection. In November, 1977, the Sedmaks asked Tom Kells, sales manager at Charlie's Chevrolet, about the availability of the Pace Car. Mr. Kells said he did not have any information on the car but would find out about it. Kells also said if Charlie's were to receive a Pace Car, the Sedmaks could purchase it.

On January 9, 1978, Dr. Sedmak telephoned Kells to ask him if a Pace Car could be ordered. Kells indicated that he would require a deposit on the car, so Mrs. Sedmak went to Charlie's and gave Kells a check for $500.00. She was given a receipt for that amount bearing the names of Kells and Charlie's Chevrolet, Inc. At that time, Kells had a pre-order form listing both standard equipment and options available on the Pace Car. Prior to tendering the deposit, Mrs. Sedmak asked Kells if she and Dr. Sedmak were "definitely going to be the owners." Kells replied, "yes." After the deposit had been paid, Mrs. Sedmak stated if the car was going to be theirs, her husband wanted some changes made to the stock model. She asked Kells to order the car equipped with an L82 engine, four speed standard transmission and AM/FM radio with tape deck. Kells said that he would try to arrange with the manufacturer for these changes. Kells was able to make the changes, and, when the car arrived, it was equipped as the Sedmaks had requested.

Kells informed Mrs. Sedmak that the price of the Pace Car would be the manufacturer's retail price, approximately $15,-000.00. The dollar figure could not be quoted more precisely because Kells was not sure what the ordered changes would cost, nor was he sure what the "appearance package"—decals, a special paint job— would cost. Kells also told Mrs. Sedmak that, after the changes had been made, a "contract"—a retail dealer's order form— would be mailed to them. However, no form or written contract was mailed to the Sedmaks by Charlie's.

On January 25, 1978, the Sedmaks visited Charlie's to take delivery on another Corvette. At that time, the Sedmaks asked Kells whether he knew anything further about the arrival date of the Pace Car. Kells replied he had no further information but he would let the Sedmaks know when the car arrived. Kells also requested that Charlie's be allowed to keep the car in their showroom for promotional purposes until after the Indianapolis 500 Race. The Sedmaks agreed to this arrangement.

On April 3, 1978, the Sedmaks were notified by Kells that the Pace Car had arrived. Kells told the Sedmaks they could not purchase the car for the manufacturer's retail price because demand for the car had inflated its value beyond the suggested price. Kells also told the Sedmaks they could bid on the car. The Sedmaks did not submit a bid. They filed this suit for specific performance.

Mr. Kells' testimony about his conversations with the Sedmaks regarding the Pace Car differed markedly from the Sedmaks' testimony. Kells stated that he had no definite price information on the Pace Car until a day or two prior to its arrival at Charlie's. He denied ever discussing the purchase price of the car with the Sedmaks. He admitted, however, that after talking with the Sedmaks on January 9, 1978,[1] he telephoned the zone manager and requested changes be made to the Pace Car. He

---

1. According to Kells' testimony, both Mr. and Mrs. Sedmak visited Charlie's on January 9, 1978. Mrs. Sedmak testified only she visited Charlie's on that date.

denied the changes were made pursuant to Dr. Sedmak's order. He claimed the changes were made because they were "more favorable to the automobile" and were changes Dr. Sedmak "preferred." In ordering the changes, Kells said he was merely taking Dr. Sedmak's advice because he was a "very knowledgeable man on the Corvette." There is no dispute, however, that when the Pace Car arrived, it was equipped with the options requested by Dr. Sedmak.

Mr. Kells also denied the receipt for $500.00 given him by Mrs. Sedmak on January 9, 1978, was a receipt for a deposit on the Pace Car. On direct examination, he said he "accepted a five hundred dollar ($500) deposit from the Sedmaks to assure them the first opportunity of purchasing the car." On cross-examination, he said: "We were accepting bids and with the five hundred dollar ($500) deposit it was to give them the first opportunity to bid on the car." Then after acknowledging that other bidders had not paid for the opportunity to bid, he explained the deposit gave the Sedmaks the "last opportunity" to make the final bid. Based on this evidence, the trial court found the parties entered into an oral contract for the purchase and sale of the Pace Car at the manufacturer's suggested retail price.

Charlie's first contends the Sedmaks' evidence is "so wrought with inconsistencies and contradictions that a finding of an oral contract for the sale of a Pace Car at the manufacturer's suggested retail price is clearly against the weight of the evidence." We disagree. The trial court chose to believe the Sedmaks' testimony over that of Mr. Kells and the reasonableness of this belief was not vitiated by any real contradictions in the Sedmaks' testimony. Charlie's examples of conflict are either facially not contradictory or easily reconcilable.

Although not clearly stated in this point or explicitly articulated in its argument, Charlie's also appears to argue there was no contract because the parties did not agree to a price. The trial court concluded "[t]he price was to be the suggested retail price of the automobile at the time of delivery." Apparently, Charlie's argues that if this were the agreed to price, it is legally insufficient to support a contract because the manufacturer's suggested retail price is not a mandatory, fixed and definite selling price but, rather, as the term implies, it is merely a suggested price which does not accurately reflect the market and the actual selling price of automobiles. Charlie's argument is misdirected and, thus, misses the mark.

■ Without again detailing the facts, there was evidence to support the trial court's conclusion that the parties agreed the selling price would be the price suggested by the manufacturer. Whether this price accurately reflects the market demands on any given day is immaterial. The manufacturer's suggested retail price is ascertainable and, thus, if the parties choose, sufficiently definite to meet the price requirements of an enforceable contract. Failure to specify the selling price in dollars and cents did not render the contract void or voidable. *See, e. g., Klaber v. Lahar*, 63 S.W.2d 103, 106–107 (Mo.1933); *see also,* § 400.2–305 RSMo 1978. As long as the parties agreed to a method by which the price was to be determined and as long as the price could be ascertained at the time of performance, the price requirement for a valid and enforceable contract was satisfied. *See Burger v. City of Springfield*, 323 S.W.2d 777, 783–84 (Mo.1959); *see also, Allied Disposal, Inc. v. Bob's Home Service, Inc.*, 595 S.W.2d 417, 419–20 (Mo.App.1980) and § 400.2–305 RSMo 1978. This point is without merit.

Charlie's next complains that if there were an oral contract, it is unenforceable under the Statute of Frauds. The trial court concluded the contract was removed from the Statute of Frauds either by the written memoranda concerning the transaction or by partial payment made by the Sedmaks. We find the latter ground a sufficient answer to defendant's complaint. We discuss it and do not consider or address the former ground.

Prior to our adoption of the Uniform Commercial Code, part payment for goods was sufficient to remove the entire contract from the Statute of Frauds. § 432.020 RSMo 1949; *Woodburn v. Cogdal*, 39 Mo. 222, 228 (1866); *See Coffman v. Fleming*, 301 Mo. 313, 256 S.W. 731, 732–733 (1923). This result followed from the logical assumption that money normally moves from one party to another not as a gift but for a bargain. The basis of this rule is the probative value of the act—part payment shows the existence of an agreement. *3 Sales & Bulk Transfers Under U.C.C.*, (Bender), § 2.04[5] at 2–96. However, "[t]his view overlooks the fact that, although . . . part payment of the price does indicate the existence of an agreement, [it does] not reveal [the agreement's] quantity term, a key provision without which the court cannot reconstruct the contract fairly and provide against fraudulent claims." *1 Hawkland, A Transactional Guide To The Uniform Commercial Code* (1964), § 1.1202 at 28. Thus, under this rule a buyer who orally purchased one commercial unit for $10.00 could falsely assert he purchased 100 units and, then, by also asserting a $10.00 payment was part payment on the 100 units, he could, in theory and in practice, convince the trier of fact that the contract entered into was for 100 units. The Code attempts to correct this defect by providing that part payment of an oral contract satisfies the Statute of Frauds *only* "with respect to goods for which payment has been made and accepted . . . ." § 400.2–201(3)(c) RSMo 1978. Under this provision, part payment satisfies the Statute of Frauds, not for the entire contract, but only for that quantity of goods to which part payment can be apportioned.[2] This change simply reflects the rationale that part payment alone does not establish the oral contract's quantity term.

In correcting one problem, however, the change creates another problem when, as in the instant case, payment for a single unit sale has been less than full. Obviously, this part payment cannot be apportioned and, thus, the question arises how shall this subsection of the Code be applied. The few courts that have considered this question have used opposing logic and, thus, reached opposing answers. At least one court reads and applies the changed provision literally and denies the enforcement of the oral contract because payment has not been received in full. *Williamson v. Martz*, 11 Pa. Dist. & Co.R.2d 33, 35 (1956). The *Williamson* Court reasoned:

> "Under the code, part payment takes the case out of the statute only to the extent for which payment has been made. The code therefore makes an important change by denying the enforcement of the contract where in the case of a single object the payment made is less than the full amount." *Id.* at 35.

Charlie's argues for this view. Other courts infer that part payment for one unit is still sufficient evidence that a contract existed between the parties and enforce the oral contract. *Lockwood v. Smigel*, 18 Cal. App.3d 800, 96 Cal.Rptr. 289 (1971); *Starr v. Freeport Dodge, Inc.*, 54 Misc.2d 271, 282 N.Y.S.2d 58 (N.Y.Dist.1967); see also, *Paloukos v. Intermountain Chevrolet Company*, 99 Idaho 740, 588 P.2d 939, 944 (1978); *Bertram Yacht Sales, Inc. v. West*, 209 So.2d 677, 679 (Fla.App.1968); *Thomaier v. Hoffman Chevrolet, Inc.*, 64 A.D.2d 492, 410 N.Y.S.2d 645, 648–649 (1978). We are persuaded by the cogency of the logic supporting this view.

> " 'Partial performance' as a substitute for the required memorandum can validate the contract only for the goods which have been accepted or for which payment has been made and accepted. . . . If the Court can make a just apportionment, . . . , the agreed price of any goods actually delivered can be recovered without a writing or, if the price has been paid, the seller can be forced to deliver an apportionable part of the goods."

---

**2.** § 400.2–201(3)(c) provides:

"(3) A contract which does not satisfy the requirements [of a writing] but which is valid in other respects is enforceable

.        .        .        .        .

(c) with respect to goods for which payment has been made and accepted or which have been received and accepted."

Interpreting this section, U.C.C. Comment 2 states:

■ Admittedly, § 400.2–201(3)(c) does validate a divisible contract only for as much of the goods as has been paid for. However, this subsection was drafted to provide a method for enforcing oral contracts where there is a quantity dispute. *See Lockwood v. Smigel, supra,* 18 Cal. App.3d 800, 96 Cal.Rptr. at 291; *see also, 1 Hawkland, supra* at 28. The subsection does not necessarily resolve the Statute of Frauds problem where there is no quantity dispute. Neither the language of the subsection nor its logical dictates necessarily invalidate an oral contract for an indivisible commercial unit where part payment has been made and accepted. If there is no dispute as to quantity, the part payment still retains its probative value to prove the existence of the contract.

■ Moreover, where, as here, there is no quantity dispute, part payment evidences the existence of a contract as satisfactorily as would a written memorandum of agreement under the liberalized criteria of the Code. The Code establishes only three basic requirements for a written memorandum to take an oral contract out of the Statute of Frauds. "First, it must evidence a contract for the sale of goods; second it must be 'signed,' a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity." § 400.2–201 RSMo 1978, U.C.C., Comment 1. Here, part payment evidences the contract for the sale of goods—the car. The party to be charged— Charlie's—is identified as the one who received payment. The quantity is not in dispute because the Sedmaks are claiming to have purchased one unit—the car. Thus, part payment here evidences the existence of a contract as satisfactorily as would a written memorandum of agreement under the Code. *Lockwood v. Smigel,* 18 Cal. App.3d 800, 96 Cal.Rptr. 289, 291 (1971); *see also Paloukos v. Intermountain Chevrolet Co.,* 99 Idaho 740, 588 P.2d 939, 944 (1978).

Finally, the Code has not changed the basic policy of the Statute of Frauds.

"The purpose of the Statute of Frauds is to prevent the enforcement of alleged promises that were never made; it is not, and never has been, to justify the contractors in repudiating promises that were in fact made." *Corbin, The Uniform Commercial Code; Should It Be Enacted?* 59 Yale L.J. 821, 829 (1950). Enforcement of the oral contract here carries out the purpose of the Statute of Frauds. Denial of the contract's existence frustrates that purpose. The present contract could not have contemplated less than one car. If the part payment is believed, it must have been intended to buy the entire car not a portion of the car. Thus, denying the contract because part payment cannot be apportioned encourages fraud rather than discouraging it. "The Statute of Frauds would be used to cut down the trusting buyer rather than to protect the one who, having made his bargain, parted with a portion of the purchase price as an earnest of his good faith." *Starr v. Freeport Dodge, Inc., supra,* 54 Misc.2d 271, 282 N.Y.S.2d at 61.

■ We hold, therefore, that where, as here, there is no dispute as to quantity, part payment for a single indivisible commercial unit validates an oral contract under § 400.-2–201(3)(c) RSMo 1978.

■ Finally, Charlie's contends the Sedmaks failed to show they were entitled to specific performance of the contract. We disagree. Although it has been stated that the determination whether to order specific performance lies within the discretion of the trial court, *Landau v. St. Louis Public Service Co.,* 273 S.W.2d 255, 259 (Mo. 1954), this discretion is, in fact, quite narrow. When the relevant equitable principles have been met and the contract is fair and plain, " 'specific performance goes as a matter of right.' " *Miller v. Coffeen,* 280 S.W.2d 100, 102 (Mo.1955). Here, the trial court ordered specific performance because it concluded the Sedmaks "have no adequate remedy at law for the reason that they cannot go upon the open market and purchase an automobile of this kind with the same mileage, condition, ownership and appearance as the automobile involved in

this case, except, if at all, with considerable expense, trouble, loss, great delay and inconvenience." Contrary to defendant's complaint, this is a correct expression of the relevant law and it is supported by the evidence.

Under the Code, the court may decree specific performance as a buyer's remedy for breach of contract to sell goods "where the goods are unique or in other proper circumstances." § 400.2–716(1) RSMo 1978. The general term "in other proper circumstances" expresses the drafters' intent to "further a more liberal attitude than some courts have shown in connection with the specific performance of contracts of sale." § 400.2–716, U.C.C., Comment 1. This Comment was not directed to the courts of this state, for long before the Code, we, in Missouri, took a practical approach in determining whether specific performance would lie for the breach of contract for the sale of goods and did not limit this relief only to the sale of "unique" goods. *Boeving v. Vandover*, 240 Mo.App. 117, 218 S.W.2d 175 (1945). In *Boeving*, plaintiff contracted to buy a car from defendant. When the car arrived, defendant refused to sell. The car was not unique in the traditional legal sense but, at that time, all cars were difficult to obtain because of war-time shortages. The court held specific performance was the proper remedy for plaintiff because a new car "could not be obtained elsewhere except at considerable expense, trouble or loss, which cannot be estimated in advance and under such circumstances [plaintiff] did not have an adequate remedy at law." *Id.* at 177–178. Thus, *Boeving*, presaged the broad and liberalized language of § 400.2–716(1) and exemplifies one of the "other proper circumstances" contemplated by this subsection for ordering specific performance. § 400.2–716, Missouri Code Comment 1. The present facts track those in *Boeving*.

The Pace Car, like the car in *Boeving*, was not unique in the traditional legal sense. It was not an heirloom or, arguably, not one of a kind. However, its "mileage, condition, ownership and appearance" did make it difficult, if not impossible, to obtain its replication without considerable expense, delay and inconvenience. Admittedly, 6,000 Pace Cars were produced by Chevrolet. However, as the record reflects, this is limited production. In addition, only one of these cars was available to each dealer, and only a limited number of these were equipped with the specific options ordered by plaintiffs. Charlie's had not received a car like the Pace Car in the previous two years. The sticker price for the car was $14,284.21. Yet Charlie's received offers from individuals in Hawaii and Florida to buy the Pace Car for $24,000.00 and $28,000.00 respectively. As sensibly inferred by the trial court, the location and size of these offers demonstrated this limited edition was in short supply and great demand. We agree, with the trial court. This case was a "proper circumstance" for ordering specific performance.

Judgment affirmed.

SMITH, P.J., and WEIER, J., concur.