**INTERNATIONAL CASINGS GROUP, INC., Plaintiff,**

v.

**PREMIUM STANDARD FARMS, INC., Defendant.**

**No. 04–1081–CV–W–NKL.**

United States District Court, W.D. Missouri, Western Division.

Feb. 9, 2005.

Andrew J. Enschede, Howard K. Jeruchimowitz, Paul Del Aguila, Paul T. Fox, Greenberg, Traurig, LLP, Chicago, IL, Michael P. Joyce, Van Osdol, Magruder, Erickson & Redmond, Kansas City, MO, for Plaintiff.

Kevin D. Mason, Todd W. Ruskamp, Shook Hardy & Bacon LLP, Kansas City, MO, for Defendant.

## ORDER

LAUGHREY, District Judge.

Pending before the Court is Plaintiff International Casing Group's ("ICG") Motion for Preliminary Injunction [Doc. # 8]. For the reasons set forth below, the Court grants ICG's Motion.

## I. Background

Defendant Premium Standard Farms ("PSF") is a pork producer that has sold its hog casings to ICG for over six years. The two PSF facilities that supply their hog casings to ICG are located in Milan, Missouri ("Milan facility"), and Clinton, North Carolina ("Clinton facility"). ICG has its own equipment and employees on site at the Clinton and Milan facilities to harvest and process the casings.

Prior to May 2002, PSF and ICG had long term output contracts for both facilities. In May 2002, PSF and ICG terminated these contracts. However, the parties continued performing under the terms of their contracts, and in June 2002, they resumed negotiations regarding new terms for both facilities. The parties negotiated a myriad of issues, including, but not limited to, an electrical room that needed re-wiring at the Clinton facility, pricing adjustments related to quality control issues (frequently referred to as the bloody guts issue) and a blower pipe at the Clinton facility. Many of these negotiations occurred via e-mail between the parties and both entities consistently relayed negotiation terms and positions to one another via electronic correspondence. The negotiations were protracted.

In early 2004, Kent Pummill ("Pummill") represented PSF in its negotiations with ICG and Tom Sanecki ("Sanecki") represented ICG. In a series of e-mails from March and April 2004, Pummill and Sanecki discussed several open issues. Because of the importance of these e-mails, the Court includes them verbatim. All of the following e-mails were sent in 2004. The Court did not include the discussions about mucosa and these redactions are noted. Additionally, the Court did not include a series of three e-mails from May 19–21, 2004, regarding an unpaid invoice by ICG. *See* Pl.Ex. 32–33.

| Date | Sender | Recipient | Text |
| --- | --- | --- | --- |
| 02/19 | Kent Pummill | Tom Sanecki | Here is where we are at. We agree that there is some blood in the casings as with all CO2 systems. We don't agree it is an 8 cent discount. We would like to offer the following: 2 cent discount on the Clinton contract; we [PSF] will pay 100% of the electrical that was completed last year; you pay for putting in the stainless steel pipe going to your building; Heparin—to make sure your doing your best in your building on mucosa. When we average more than 41,000 units of heparin in a month, we will give you 30% of that dollar amount, for anything over and above 41,000 units. Where are your sticking points, so we can get both plants under contract and behind us?<br><br>Thanks, Kent |
| 02/26 | Kent Pummill | Tom Sanecki | Did you get my e-mail. What is your counter-offer? I agree, we have gone too long. Lets get this cleaned up.<br><br>Thanks, Kent |
| 02/26 | Tom Sanecki | Kent Pummill | I am in LA this week, I will call you next week to discuss, or would you prefer Eric and I come to KC for a quick meeting next week. We would be available Tuesday–Thursday. |
| 02/26 | Kent Pummill | Tom Sanecki | Bo is traveling. Shoot me your counter offer next week, and lets get this moving. |

| | | | |
|---|---|---|---|
| 03/18 | Tom Sanecki | Kent Pummill | I will be out of the office thru 03/29/04. |

I have the following questions and I think we should schedule a meeting in KC to get this resolved.

[Deleted discussion regarding mucosa]

Electrical room and blow pipe—not to beat a dead horse but, I think getting the guts, undamaged, to the casing department should be PSF''s responsibility. ICG paid for the blow system and it has worked for years. It has only been since it has been disassembled by your maintenance department for cleaning that we have been having problems with damaged guts.

The quote we have is for $25,000, I expect this to go up due to the increases in the cost of steel, my guess is an additional $8,000–$10,000. We also need to make sure that the finish is not going to cause damage. My suggestion is that ICG will pay for the pipe and turn the blower system over to PSF, if PSF will extend both contracts an additional two years.

The remaining issue is the compensation for the bloody guts. $0.02 is not enough to compensate for the additional processing required. I suggest that we schedule a meeting for either 04/06/04 or 04/07/04 in KC. Please let me know your thoughts.

| | | | |
|---|---|---|---|
| 03/23 | Kent Pummill | Tom Sanecki | We might as well schedule a meeting then, because if you want more than 2 cents, then our plan is to put it back out to bid. |

[Deleted discussion regarding mucosa]

We have paid for the electrical room. You pay for the pipe. Sounds like it just comes down to the discount # . We will do a 2 cent discount at Clinton and will go 5 years on a new contract for both plants. Your choice, this or us putting both plants back out to bid. Let me know, we would be glad to meet.

Thanks, Kent

| | | | |
|---|---|---|---|
| 04/19 | Tom Sanecki | Kent Pummill | I am not happy about the $0.02. The mucosa is fine, it would be helpful if yield numbers we provided to us so we can continue to work on optimizing the collection and the feedback is very important. |

The pipe vs. the electrical room is ok, and the sooner we get this contract signed the better, we need to get this pipe replaced. It is effecting our yields. Do we agree that when ICG pays for the pipe replacement and we have the 5 year contract that PSF will take responsibility and ownership of the pipe?

Can we do something about the costs we have incurred with the bloody guts we have already processed? This started in January 15, 2003, so for

16+ months. Can we get an additional $0.02 for the next 16 months or an additional $0.005 off for the 5 year contract?

Please call me when you get a chance [phone number deleted].

| 04/20 | Kent Pummill | Tom Sanecki | Send the new contracts with a decrease of $0.025 for the next 5 years at Clinton. We will take ownership of the new pipe installed by ICG after it is installed.<br><br>Thanks, Kent |
|---|---|---|---|
| 04/27 | Tom Sanecki | Kent Pummill | I have sent you 4 copies of each contract. I have initialed and signed each. Please have Bo sign and initial and return 2 copies to ICG.<br><br>I put the effective date of the $0.025 reduction at Clinton for 05/03/2004. ICG will get the blow pipe replaced ASAP after receiving the signed contracts. PSF will maintain the blow system and at the end of the new contract it will become PSF's property.<br><br>PSF will pay for the electrical room upgrades at Clinton. Thanks for your help. |
| 04/27 | Kent Pummill | Tom Sanecki | Will do. Thank you.<br><br>Kent |
| 05/10 | Tom Sanecki | Kent Pummill | How are the contracts going????? |
| 05/10 | Kent Pummill | Tom Sanecki | Legal has them. I will double check this morning. |
| 06/07 | Kent Pummill | Tom Sanecki | Finally got them back from Legal an d Bo Manly. Everything looks fine except on 2G. Jerry wants to have 2G end with "ADA" and mark through the following: "and will defend and indemnify ICG against any claims by Premium employees unless due to gross negligence by ICG employees or their agents." He says this is covered in 10.<br><br>Bo is adamant about not going 5 years. He turned 180 degrees on me. He wants just 3. If you can agree with me on 3 years, then I will mark through and initial the "2G" section and change and initial the term to 3 years, and get Bo to sign and send them on their way.<br><br>I thought we were home free; we are real close. Will this work for you? I will take another penny off the price for Clinton to get this signed and off my desk. I think you and I are both tired and want this off our desks. Let me know.<br><br>Kent |
| 06/21 | Tom Sanecki | Kent Pummill | OK, but as you can imagine I am surprised by this change. Do you want to mark-up your contract and mark the price schedule, then sign and send to me. We will get the blow pipe done ASAP. Thanks. |

| 06/21 | Kent Pummill | Tom Sanecki | We will mark up the contract and send it to you. Thanks, Kent. |
| | | | Send me a new pricing schedule, and I will attach the new one to Clinton's contracts. |
| 06/21 | Tom Sanecki | Kent Pummill | Shall we make these prices effective 06/28/2004? |
| 06/21 | Kent Pummill | Tom Sanecki | That is fine. |

The "contracts"[1] referred to in Sanecki's April 27, 2004, e-mail outlined the payment mechanism for the casings and provided that the price of the casings would be based on a price benchmark contained in the Pratt Report, which is a trade publication used by the casings industry. The pricing schedule was attached to each "contract," incorporated by reference, signed by Sanecki and sent to PSF. The pricing schedule reflected that ICG was paying less for the casings from the Clinton facility than those from the Milan facility.[2] These "contracts" were for five years.

In his June 7 e-mail to Sanecki, Pummill agrees to take off another penny for the Clinton casings in exchange for a three instead of a five year contract. After receiving Sanecki's agreement to the three year duration, Pummill marked up the contracts and gave them to Robert W. (Bo) Manly ("Manly") for Manly's signature. Manly is the president of PSF. While awaiting Manly's signature on the contracts, ICG and PSF implemented the new pricing schedules as of June 28, 2004. In July 2004, Sanecki inquired a few times about obtaining the written contracts and Pummill responded that Manly still had them.

On August 2, 2004, Pummill e-mailed Sanecki to tell him that Calvin Held ("Held") was now supervising both the Milan and Clinton facilities and that Manly wanted Held to "approve" the contracts for the two facilities. Pummill also indicated that Held was inquiring about why ICG was paying less money for the casings from the Clinton facility than the casings from the Milan facility. In September 2004, Sanecki met with Held to discuss the price disparity between the two facilities. It appears that Held did not notify Sanecki at that meeting that PSF would not honor the pricing arrangement. The new prices continued to be paid even after the meeting.

On November 17, 2004, PSF sent ICG written notice of its intent to terminate the parties' business relationship. PSF's termination letter anticipated that the Milan facility relationship would terminate on January 3, 2005, and the Clinton facility relationship would terminate on January 10, 2005. Prior to this notice, PSF had already started negotiating with a third party[3] to purchase the casings from the Milan and Clinton facilities. As of the date of the preliminary injunction hearing, PSF had contracted with Standard Cas-

---

1. Sanecki referred to these documents as contracts. The Court does not believe a contract was reached as of April 27, 2004; hence, the use of quotation marks.

2. According to ICG, the differential was in part because of the quality control issues at the Clinton facility.

3. The third party is Standard Casings Company, owned by Roger Theise. Roger Theise previously worked for ICG.

ings Company ("Standard") to sell its Milan and Clinton casings to Standard.

On January 7, 2005, the Court held an evidentiary hearing regarding ICG's Motion for Preliminary Injunction. Pending resolution of that Motion, the parties are performing under the terms reached as of June 21, 2004. After the preliminary injunction hearing, the Court was notified that Standard has moved its equipment to Missouri and North Carolina and is ready to begin harvesting the casings at PSF's facilities.

## II. Discussion

In determining whether to grant a preliminary injunction, courts weigh four factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between the harm to the movant and any harm that granting the injunction will cause to other parties to the litigation; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981).

### A. Success on the Merits [4]

#### 1. *Meeting of the Minds*

■ To be successful, ICG must establish that it has a contract with PSF. The parties agree that this transaction is controlled by the UCC which provides:

> (1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
>
> . . . .

(3) Even though one or more terms are left open, a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Mo.Rev.Stat. § 400.2–204. PSF contends that it has no agreement with ICG because there was never a "meeting of the minds," particularly, with reference to price.

PSF is correct that ICG must establish that there was a "meeting of the minds" between ICG and PSF. *Dierker Associates D.C., P.C. v. Gillis,* 859 S.W.2d 737, 743 (Mo.Ct.App.1993); *Paul's Rod & Bearing, Ltd. v. Kelly,* 847 S.W.2d 68, 72 (Mo.Ct. App.1991).[5] Whether a meeting of the minds exists, however, "is determined objectively by looking at the intent of the parties as expressed by their actual words or acts." *Paul's Rod & Bearing, Ltd.,* 847 S.W.2d at 72. *See Computer Network, Ltd. v. Purcell Tire & Rubber Co.,* 747 S.W.2d 669, 675 (Mo.Ct.App.1988). A meeting of the minds cannot be "determined on the undisclosed assumption or secret surmise of either party." *Computer Network, Ltd.,* 747 S.W.2d at 675 (quoting *Shofler v. Jordan,* 284 S.W.2d 612, 615 (Mo.Ct.App.1955)). This is because Missouri follows the objective theory of contracts. *Computer Network, Ltd.,* 747 S.W.2d at 675. "The objective theory lays stress on the outward manifestation of assent made to the other party in contrast to the older idea that a contract was a true 'meeting of the minds.'" *Id.* (quoting J. Calamari & J. Perillo, CONTRACTS § 2–13, at 23 (2d ed.1977)).

---

4. For purposes of this subsection of the Court's Order, North Carolina's UCC provisions are identical to Missouri's. Thus, the Court will evaluate the parties' claims under Missouri law, but the analysis will be equally applicable to the Clinton facility contract that is governed by North Carolina law. The

Court will provide parallel citations to North Carolina authorities where appropriate.

5. North Carolina contract law also requires a meeting of the minds. *See The Currituck Associates v. Hollowell,* 601 S.E.2d 256, 263 (N.C.Ct.App.2004); *Fulk v. Piedmont Music Center,* 531 S.E.2d 476, 480 (N.C.App.2000).

There is substantial evidence to show that PSF and ICG did reach a meeting of the minds on June 21, 2004 for a new three year, hog casing, output contract for the Milan and Clinton facilities. The parties had been negotiating since 2002 and had resolved most of the issues in dispute by April of 2004. Price, the bloody guts issue and the defective pipe at the Clinton facility were still being discussed. On March 23, Kent Pummill, who had authority to negotiate on behalf of PSF, said:

> We have paid for the electrical room. You pay for the [Clinton] pipe. Sounds like it just comes down to the discount #. We will do a 2 cent discount at Clinton and will go 5 years on a new contract for both plants. Your choice, this or us putting both plants back out to bid. Let me now, we would be glad to meet.

Tom Sanecki, who had authority to negotiate for ICG, responded by accepting some of Pummill's proposal and raising additional issues. The following day, Pummill instructs Sanecki to send the new contracts with a decrease of $.025. Mr. Sanecki does so and there is no response from PSF until June 7, 2004 when Mr. Pummill writes:

> Finally got them [contracts] back from legal and Bo Manly. Everything looks fine except on 2G. Jerry [PSF general counsel] wants to have 2 G end with "ADA" and mark through the following: [language unrelated to this dispute]. Bo is adamant about not going 5 years. He turned 180 degrees on me. He wants just 3. If you can agree with me on 3 years, then I will mark through and initial the "2G" section and change and initial the term to 3 years, and get Bo to sign and send them on their way. I thought we were home free; we are real

close. Will this work for you? I will take another penny off the price for Clinton to get this signed and off my desk.

Mr. Sanecki responds OK. At that point, both parties had agreed on all the essential terms of the contract. While PSF now contends that the price issue was unresolved, that argument is inconsistent with its agreement to implement the new prices effective June 28, 2004 pursuant to an e-mail exchange between Sanecki and Pummill on June 21, 2004. That agreement occurred on the same day that both sides had resolved all outstanding issues under discussion and Pummill had offered a lower price for the Clinton facility [6] and Sanecki had accepted it.

PSF also argues that there were oral communications with ICG, in addition to the e-mails, that demonstrate that the price issue was never resolved. However, the Court does not find support in the preliminary injunction hearing record for that position. There were conversations about price before the June 21 e-mail but those disputes were resolved in the June 21 e-mail and the parties implemented the new, agreed upon pricing system. That is the best objective evidence that the issue of price was resolved on June 21. There were also discussions about price after the June 21 e-mail, but the best explanation for those discussions was the change in management at PSF and not the absence of a meeting of the minds on June 21.

Sometime after June 21, 2004, and before August 2, 2004, PSF placed Calvin Held over both the Clinton and Milan facilities. August 2 is the first time that PSF notifies ICG that Held is "approving both contracts." An inquiry is made by PSF on that date as to why there is a difference

---

6. By this point, only the Clinton price was in dispute. The Milan price had been agreed to earlier.

between the price at Milan and the price at Clinton. A meeting is arranged with Held and at that meeting he is told by Sanecki the reason for the price differential. It does not appear that PSF told ICG at that meeting that the price being paid pursuant to the June 21 agreement was unacceptable or notified ICG that it would no longer pay that price. In fact, the price was paid by PSF through 2004. Indeed, the new prices remained in effect even after PSF notified ICG that it must vacate the Milan and Clinton facilities. While it is possible that a jury may conclude differently, it is more likely that a jury will believe that Held, the new PSF manager, didn't like the deal that had been struck for his facilities and PSF was back tracking on an agreement that had already been made.

Finally, PSF contends that there was no meeting of the minds on June 21, 2004, because the agreement was never reduced to writing and signed by both parties. However, merely because parties intend a written memorialization of the agreed upon terms does not demonstrate that they intend the writing to be a condition precedent to the formation of a contract. "Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof . . . ." 1 Restatement of the Law of Contracts, Ch. 3, § 26. The real question is whether the parties intended a written document to be a condition precedent to the formation of a binding contract. *Sanders v. DeWitt*, 579 S.W.2d 707, 711 (Mo.Ct.App.1979); *Priest v. Oehler*, 328 Mo. 590, 41 S.W.2d 783, 787 (1931); *Shapleigh Inv. Co. v. Miller*, 193 S.W.2d 931, 937 (Mo.Ct.App.1946); 17 AM. JUR.2D *Contracts* § 28, pp. 363–66. It is also stated that where there is an intent by the parties not to be bound by the oral contract but only by a later prepared and signed written contract, such an intention must be specifically understood in the original agreement. *Hunt v. Dallmeyer*, 517 S.W.2d 720, 724 (Mo.Ct.App.1974).

Considering the evidence presented at the preliminary injunction hearing, the Court concludes that a jury is likely to find that the parties intended that their agreement be reduced to writing as a memorialization. They did not intend the writing to be a condition precedent to the formation of the contract. Pummill's e-mail on June 7, 2004, said that everything looked fine except two things. Sanecki then agreed to PSF's proposal concerning those two things. The parties then implemented the new pricing structure which was the major stumbling block to the formation of the contract. In his June 21 e-mail, Pummill says that "we" will mark up the contracts to conform to the agreement and PSF was then to send them to ICG. At no time does Pummill say "I" will mark them up and then give them to Manley for his approval, and if Manly approves them, we will send them to you. There is nothing in the communications or the actions of the parties that suggest that no contract was formed until the paper documents were formally signed by both Sanecki and Manly. *See Hunt v. Dallmeyer*, 517 S.W.2d 720, 724 (Mo.Ct.App.1974) (where there is an intent by the parties not to be bound by the oral contract but only by a later prepared and signed written contract, such an intention must be specifically understood in the original agreement).

Nor is there objective evidence to indicate that Pummill did not have the authority to enter into the agreement on behalf of PSF. The evidence strongly suggests that he had authority to bind PSF. While there is evidence that suggests that Sanecki did not want to make repairs required by the terms of the agreement until there was a writing, this does not mean that the par-

ties intended the written documents be a condition precedent to the formation of a contract. Sanecki was obviously concerned about making the repairs on the defendant's property in the event that PSF attempted to backtrack on its agreement. It was also a minor issue in comparison to the implementation of the new pricing structure which was done as of June 28, 2004. It is probable that a jury will find that a written document with a formal signature was not a condition precedent to the formation of the contract.

### 2. *Statute of Frauds*

■ Because this dispute involves a contract for the sale of goods in excess of five hundred dollars, it must satisfy the Statute of Frauds or one of the exceptions to it. Mo.Rev.Stat. § 400.2–201 (applying the Statute of Frauds to contracts exceeding five hundred dollars).[7] PSF contends that the Statute of Frauds has not been satisfied because the agreement was not in writing and was not signed. ICG contends that the April 27, 2004, documents and the e-mails between Pummill and Sanecki satisfy the writing and signature requirements of the Statute of Frauds.

The Statute of Frauds has two requirements relevant to this dispute. *See* Mo. Rev.Stat. § 400.2–201.[8] The writing must evidence a contract for the sale of goods and "it must be 'signed,' a word which includes any authentication which identifies the party to be charged ...." *Howard Construction Co. v. Jeff–Cole Quarries,* 669 S.W.2d 221, 226 (Mo.Ct.App.1983); *also see Sedmak v. Charlie's Chevrolet, Inc.,* 622 S.W.2d 694, 699 (Mo.Ct.App. 1981); *Vess Beverages, Inc. v. Paddington Corp.,* 886 F.2d 208, 213 (8th Cir.1989).

---

**7.** *See* N.C. Gen.Stat. § 25–2–201.

**8.** *See* also N.C. Gen.Stat. § 25–2–201 at cmt. 1.

### a. Written Contract for the Sale of Goods

As previously indicated, the Court has concluded that it is probable that the e-mail exchange between Sanecki and Pummill and the written contracts sent by Sanecki on April 27, 2004, established a contract which contained all the essential terms of the parties' output agreement for the Milan and Clinton facilities.

The fact that the terms of the agreement are contained in separate documents does not prevent compliance with the Statute of Frauds. To satisfy the Statute of Frauds, the writing "may comprise several writings that, in combination, supply the essential terms." *Vess Beverages, Inc. v. Paddington Corp.,* 941 F.2d 651, 654 (8th Cir.1991) (applying Missouri law).[9] The content of the e-mails establishes that the document sent by Sanecki on April 27, 2004, were part of the negotiated terms, as were the terms specifically resolved by the e-mails. Therefore, it is probable that ICG will convince the jury that the documents sent by Sanecki on April 27, 2004 and the parties' subsequent e-mail communications establish a binding written contract for the sale of goods that contain all the essential terms.

### b. The Signature

The more difficult question is whether the writings which evidenced the sale of goods were signed. The answer depends on the definition of "signature" in the context of the UCC.

■ The UCC's definition of "signed" includes "any symbol executed or adopted by a party with present intention to au-

---

**9.** *See also Schafer v. Barrier Island Station, Inc.,* 946 F.2d 1075, 1078 (4th Cir.1991) ("the statute of frauds may be satisfied by several writings which relate to each other") (applying North Carolina law).

thenticate a writing." Mo.Rev.Stat. 400.1–201(39). The Comment to the UCC's definition states:

The inclusion of authentication in the definition of 'signed' is to make clear that as the term is used in this Act a complete signature is not necessary. Authentication may be printed, stamped or written; it may be by initials or by thumbprint. It may be on any part of the document and in appropriate cases may be found in a billhead or letterhead. No catalog of possible authentications can be complete and the court may use common sense and commercial experience in passing upon these matters.

*Id.* at Cmt. ¶ 39.

Missouri has also adopted the Uniform Electronic Transactions Act ("UETA"). *See* Mo.Rev.Stat. §§ 432.200–432.295.[10] The UETA applies to Missouri's UCC provisions that govern the Statute of Frauds and the UETA defines an electronic signature as, "An electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." Mo.Rev.Stat. § 432.205(8).[11] Moreover, the UETA states, "If a law requires a signature, an electronic signature satisfies the law." Mo.Rev.Stat. § 432.230(4).[12] Hence, although Pummill's and Sanecki's signatures were electronic, they satisfy the signature requirement of the UCC's Statute of Frauds, so long as each had the present intention to authenticate the document.

There is overwhelming evidence that Sanecki's and Pummill's e-mails are authentic and that the information contained in them was intended by each to accurately reflect their communications with the other. Although they do not all contain a typed name at the bottom of the e-mails, each e-mail contains a header with the name of the sender. Given the testimony at the preliminary hearing, it is clear that Sanecki and Pummill, by hitting the send button, intended to presently authenticate and adopt the content of the e-mails as their own writing. This is enough to satisfy the UCC given the breadth of its definition of signature, as well as the UETA which specifically refers to a "process attached to or logically associated with a record." [13]

Furthermore, the purpose of the UCC is to prevent fraud. *See* 73 AM. JUR. 2D *Statute of Frauds* § 425. In this case, there is no dispute about the content or authenticity of the parties' communications. Therefore, neither fraud nor perjury is a concern. Indeed, it would be contrary to the purpose of the UCC to permit a party to negotiate all the terms of an agreement, do so in a way which accurately records their negotiations and agreement, but then permit the party to escape responsibility for its promises because a piece of paper with a handwritten signature has not been produced. *See* 73 AM. JUR. 2D *Statute of Frauds* § 468 ("The courts do not tolerate the use of the stat-

---

**10.** *See generally* N.C. Gen.Stat. §§ 66–311 to 66–326 (N.C.UETA).

**11.** *See also* N.C. Gen.Stat. § 66–312(9) (definition of "electronic signature").

**12.** *See also* N.C. Gen.Stat. § 66–317(d).

**13.** The Court is aware that an e-mail can be fraudulently sent, indicating it is from one person when it is in fact from someone else. However, a contract written on paper can be forged. With e-mail, it can readily be determined whether the e-mail came from the computer of the reported sender or not, just as there are ways to determine whether a signature is forged. Therefore, the fact that the e-mail header with the name of the sender can be electronically "forged," should not render it an insufficient signature as a matter of law. Of course, this issue is irrelevant here because Pummill has acknowledged under oath that he sent the e-mails.

ute of frauds to enable one to take advantage of a person's own wrong and it ought not to be used as a means to allow persons who have made a promise to circumvent their obligations.").

The Court's finding that an electronic signature in an e-mail satisfies the Statute of Frauds is supported by the developing case law. *See Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289 (7th Cir.2002); *Roger Edwards, LLC v. Fiddes & Son, Ltd.*, 245 F.Supp.2d 251 (D.Me.2003); *Central Illinois Light Co. v. Consolidation Coal Co.*, 235 F.Supp.2d 916, 919 (C.D.Ill.2002); *Commonwealth Aluminum Corp. v. Stanley Metal Association*, 186 F.Supp.2d 770, 774 (W.D.Ky.2001); *Rosenfeld v. Zerneck*, 4 Misc.3d 193, 776 N.Y.S.2d 458 (N.Y.Sup. 2004); *Shattuck v. Klotzbach*, 2001 WL 1839720, No. 011109A (Mass.Super. Dec. 11, 2001); *Amedisys, Inc. v. JP Morgan Chase Manhattan Bank (In re National Century Financial Enterprises, Inc.)*, 310 B.R. 580, 595 (Bankr.S.D.Ohio 2004).

Commentators have also suggested that an e-mail "signature" is sufficient to satisfy the Statute of Frauds provision in the UCC. 12 ANDERSON ON THE COMMERCIAL CODE § 106:6ES (explaining that a valid signature includes "a name as part of an e-mail ... if the requisite intention is present."); Richard Allan Horning, *Has Hal Signed A Contract: The Statute of Frauds in Cyberspace*, 12 SANTA CLARA COMPUTER & HIGH TECH. L.J. 253 (August 1996); Jean Braucher, *Rent–Seeking and Risk–Fixing in the New Statutory Law of Electronic Commerce: Difficulties in Moving Consumer Protection Online*, 2001 WIS. L. REV. 527 (2001); Steven Domanowski, *E-Sign: Paperless Transactions in the New Millennium*, 51 DEPAUL L. REV. 619 (Winter 2001).

PSF has cited *Toghiyany v. AmeriGas Propane, Inc.*, 309 F.3d 1088, 1090–91 (8th Cir.2002), for the proposition that an e-mail cannot satisfy the signature requirement of the Statute of Frauds. In *Toghiyany*, the Eighth Circuit held that a contract was not enforceable because it lacked a durational term. The court also said the following:

> Furthermore, the documents constituting the contract must be signed, or, in the alternative, one document must be signed, so long as the others are significantly related to it. *Vess Beverages*, 941 F.2d at 654. An enforceable contract cannot be inferred from the writings supplied by the parties in this case because the writings—various e-mails and draft agreements—neither contain the essential durational element nor are signed. *Id.; see also Kansas City Power & Light Co.* at 1003.

*Id.* The cases cited by the Eighth Circuit in *Toghiyany, Vess Beverages, Inc. v. Paddington Corp.*, 941 F.2d 651 (8th Cir.1991), and *Kansas City Power & Light Co. v. Burlington N. R.R. Co.*, 707 F.2d 1002 (8th Cir.1983), do not deal with the electronic signature issue nor does the court explain why it concludes that the e-mails are not signed. So while *Toghiyany* "tugs the other way," *Cloud*, 314 F.3d at 296, the Court does not believe it precludes the decision reached today in this case. Significantly, the UCC's definition of "signature" did not apply in *Toghiyany* because the sale was not governed by the UCC. Second, *Toghiyany* was decided before the enactment of the Missouri UETA which was passed in 2003—one year after the Eighth Circuit issued its opinion in *Toghiyany*. The UETA, therefore, best reflects Missouri's law at the time these e-mails were exchanged. Third, in *General Trading Int'l, Inc. v. Wal–Mart Stores, Inc.*, 320 F.3d 831 (8th Cir.2003), another panel of the Eighth Circuit suggests but does not explicitly state that an e-mail can satisfy the Statute of Fraud's signature requirement. *See* Cohen, Henning & Rusch, *The Frontiers of Article 2: Software Contracts, Rolling Contracts, and Electronic*

*Commerce in Goods*, SK038 ALI–ABA 1, 10 (December 9–11, 2004). Like *Toghiyany*, *General Trading* was decided on other grounds so the current status of the UCC and electronic signatures is unclear in the Eighth Circuit.

PSF also argues that the Missouri and North Carolina UETA do not apply to Pummill's e-mails because the Acts require that the transactions are between "parties each of which has agreed to conduct transactions by electronic means." Mo.Rev. Stat. 432.220(2).[14] In determining whether the parties have agreed, the Court may look to "context and surrounding circumstances, including the parties' conduct." *Id.* The Court has done so and concluded that a fact finder will probably infer from the objective evidence that the parties agreed to negotiate and eventually reach the terms of an agreement via electronic mail based on their ongoing e-mail negotiations during all of 2003 and the beginning of 2004. Moreover, the parties' continued performance after the new pricing structure took effect on June 28, 2004, demonstrates they intended to reach an agreement via the June 2004 e-mails.

Furthermore, in determining whether PSF agreed to "conduct transactions by electronic means," the Court looks to whether Pummill intended to authenticate the writing—not whether he subjectively intended to enter into a contract. In *Vess Beverages*, the court rejected the argument that an individual authenticated his meeting notes when he created an attendance list for the meeting and included his own initials among the initials of the other attendees. 941 F.2d at 655. The court stated, "the signature need not be legally effective assent to the contract, but the signer must sign with the intent to indicate that the document is his." *Id.* The court further stated, "Lest there be any confusion, we emphasize that the standard is whether the party to be charged signed the writing with intention to authenticate *the writing*. Although one who signs a writing with intent to assent to its terms or to authenticate that an agreement exists fulfills the signature requirement in so doing, neither of these latter two types of intent is necessary to satisfy the Statute of Frauds." *Id.* at n. 5. Thus, in determining whether Pummill had the "present intention to authenticate" his June 2004 e-mails, the Court has considered whether Pummill intended to verify that the e-mails were his communications—not whether Pummill's e-mails manifested a subjective intent to formalize in writing a binding contract. To find otherwise would undermine the objective theory of contracts which Missouri follows.

Accordingly, the Court finds that it is probable that ICG will prevail on the merits regarding the formation of a binding contract which satisfies the Statute of Frauds.

### B. Irreparable Harm

ICG claims that it will suffer irreparable harm if the Court denies its pending Motion and allows PSF to withdraw its supply of hog casings to ICG.[15]

14. *See also* N.C. Gen.Stat. § 66–315.

15. PSF argues that ICG limited its potential remedies by virtue of the April 2004 agreements, which contain a paragraph that stated, "In the event of a default by either of the parties hereto, the other (i.e., the non-defaulting) party shall be entitled to (1) terminate the Agreement and (2) recover from the defaulting party whatever damages it shall rightfully be entitled to under applicable provisions of governing law." However, this clause cannot be construed to limit ICG's right to seek injunctive relief because a paragraph that purports to set forth the sole remedy must clearly express that it is the sole remedy. Mo.Rev. Stat. § 400.2–719(1)(b); N.C. Gen.Stat. § 25–2–719(1)(b). The Court finds no such language in the foregoing paragraph and, accordingly, the Court rejects PSF's argument regarding ICG's alleged sole remedy.

Under the UCC, a court may order specific performance of a contract for the sale of goods where "the goods are unique or in other proper circumstances." Mo.Rev. Stat. § 400.2–716.[16] UCC § 2–716(1). According to the Comment, goods are unique where a "particular or peculiarly available source or market" exists or where there is an inability to obtain cover goods. *Id.* at Comm. 1. In determining whether a party has alternative remedies available that would warrant the denial of injunctive relief, courts have stated that the alternative remedy "must be as certain, prompt, complete, and efficient to attain the ends of justice as a decree of specific performance." *Laclede Gas Co. v. Amoco Oil Co.,* 522 F.2d 33, 40 (8th Cir.1975). Thus, the test is whether PSF is a "particular or peculiarly available source" for hog casings and whether ICG has an alternative remedy available to it.

Processing companies purchase hog casings from one of two sources in the industry: (1) long-term supply contracts with a slaughterhouse like those at issue in this dispute, or (2) the spot market where buyers may purchase casings that are not subject to long-term contracts. PSF asserts that ICG can obtain adequate cover goods from the spot market to supplement its supply. The parties do not generally dispute that ICG can obtain additional hog casings from the spot market; however, the parties vigorously dispute whether those casings are satisfactory for ICG's particular purposes.

Under its contracts with PSF, ICG controls the initial processing and cleaning mechanisms that it uses to prepare the casings. These methods are proprietary and specific to ICG and the casings that it sells to its customers. If ICG is forced to seek casings from suppliers on the spot market, then it will not have control over the processing and cleaning of the casings

and it will not be able to implement its proprietary methods. Moreover, to produce the casings that it sells to its customers, ICG needs casings from its suppliers that have certain characteristics including, but not limited to, consistent color and slip and certain length percentages. All of these characteristics that ICG needs bear on the quality of the casings and the credible evidence does not suggest that the spot market can produce casings of the same quality as PSF.

At the hearing on ICG's pending Motion, PSF demonstrated that ICG can obtain other hog casings from the American spot market and from foreign casings markets. However, PSF did not demonstrate that these replacement casings are of the same quality and specification as ICG obtains from PSF. ICG has demonstrated that the casings produced by PSF are not fungible and not readily available on the spot market; thus, the Court concludes on the current record that ICG cannot find cover goods to replace PSF's casings.

In addition to being unable to find comparable cover casings, ICG also established that it will suffer harm to its good will and reputation in the casings industry if an injunction is not issued. Without PSF's casings, ICG will be unable to satisfy its obligations to its customers, thereby causing those customers to look to other suppliers. The loss of customers is further exacerbated by the limited pool of potential new customers. Thus, ICG provided credible evidence that its current relationships will be adversely affected by PSF's repudiation, that ICG will be unable to ameliorate these relationships in the near future, and that PSF's repudiation will affect ICG's long-term ability to attract new customers. This loss of good will can be a basis for irreparable harm and the Court finds that ICG will suffer

**16.** *See also* N.C. Gen.Stat. § 25–2–716.

irreparable harm unless it grants ICG's pending Motion. *See Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.,* 336 F.3d 801, 805 (8th Cir.2003) (loss of good will can constitute irreparable harm) (citation omitted).

## C. Balance of the Harms

■ ICG has established that if the Court does not grant its Motion, then it will immediately lose 50% of its supply of casings and be unable to fulfill its orders to its customers. Moreover, ICG has established that its class of potential customers is limited to a narrow group of companies and that its failure to fulfill its orders will have detrimental long-term consequences on its ability to obtain new sources of revenue or renew its contacts with customers that it loses. Thus, if the Court denies ICG's Motion, then it will suffer an immediate loss, both in terms of revenue and customer loyalty, but it will also suffer a prospective loss in the form of damage to its relationships with its customers.

PSF, on the other hand, will also suffer harm if the Court grants ICG's Motion. Prior to terminating its relationship with ICG, PSF negotiated and procured an agreement with another casings processor that agreed to purchase its casings output. PSF argues that if the Court grants ICG's Motion, then it will have to renege on its contract with the new buyer and potentially face litigation for that breach.

Weighing the potential harms to the parties, the Court finds the equities weigh in favor of ICG. ICG's potential loss is great and will continue into the future; for these reasons, it is not capable of quantification. To the extent that PSF suffers harm, that harm will be in the form of performing a contract that the parties negotiated and bargained for, and the Court cannot refuse ICG an appropriate remedy because PSF undertook to enter into nego-

tiations with a third party after having second thoughts about its June 2004 agreement. Thus, the Court finds that the balance of the harms favors ICG.

## D. The Public Interest

Similarly, the Court finds that the public interest also favors enforcing the contracts in favor of ICG. As outlined above, the parties negotiated a binding agreement for both facilities and the general public has an interest in courts enforcing binding contracts. Thus, the public interest weighs in favor of ICG.

## E. Summary

■ Because the parties' writings in April and June 2004 manifest a meeting of the minds regarding their intentions to enter into an agreement and because those writings are authenticated in a way that satisfies the Statute of Frauds, the Court finds that ICG is more likely to succeed on the merits of its claim. Although ICG's success is not guaranteed because some of the issues are factual in nature and reserved for juries, the Court finds that it is more likely than not based on the evidence before the Court at this juncture. Additionally, the Court finds that ICG cannot obtain cover goods that are of the same quality and degree as those produced by PSF and that ICG will suffer the greater harm if the Court does not grant ICG's pending Motion. Finally, the Court finds that the public interest weighs in favor of enforcing the parties' agreement. Therefore, the four factors outlined in *Dataphase,* 640 F.2d at 114, weigh in favor of granting ICG's Motion for Injunction.

## III. Conclusion

Accordingly, it is hereby

ORDERED that International Casing Group, Inc.'s Motion for Preliminary Injunction [Doc. # 8] is GRANTED.