**John KHOURY, Appellant**

**v.**

**Prentis B. TOMLINSON, Jr., Appellee**

**NO. 01–16–00006–CV**

Court of Appeals of Texas,
Houston (1st Dist.).

Opinion issued March 30, 2017

Terry B. Joseph, David M. Lodholz, Matthews, Lawson, McCutcheon & Joseph, PPLC, Houston, TX, for Appellant.

John L. Dagley, Buck Keenan LLP, Houston, TX, for Appellee.

Panel consists of Justices Keyes, Higley, and Lloyd.

## OPINION ON REHEARING

Laura Carter Higley, Justice

John Khoury sued Prentis B. Tomlinson, Jr., alleging securities violations under the Texas Securities Act, common-law fraud, and breach of contract. The jury found in favor of Khoury on all three claims. In response to Tomlinson's motion for judgment notwithstanding the verdict, the trial court disregarded the jury's findings of liability on Khoury's securities violations and breach of contract claims. In three issues on appeal, Khoury argues that the trial court erred by disregarding the jury's findings on his securities and breach of contract claims and that, as a result, he is entitled to judgment recovering his attorneys' fees. In seven issues on cross-appeal, Tomlinson argues the trial court erred by denying his motion for judgment notwithstanding the verdict on Khoury's fraud claim.

Tomlinson filed a motion for rehearing for our December 22, 2016 opinion. We grant the motion for rehearing, withdraw our prior opinion and judgment, and issue this opinion and a new judgment in their place. We deny the motion for en banc reconsideration as moot.

We reverse and remand.

## Background

Tomlinson is the president and CEO of PetroGulf, Ltd., a company "formed in August 2008 to be a physical trader of fuel oil and crude oil from Iraq into selective markets in the region." On December 9, 2008, Tomlinson met with Khoury and presented him with an 11–page business plan, seeking investment in PetroGulf. The business plan offered to pay investors 14% interest on their investment along with sharing 10% of net profits. The business plan identified its initial goal was "to build an ongoing business to purchase, transport and sell fuel oil from Iraq initially to Syria and Kurdistan." After that, the goal was to expand into other markets.

The business plan makes repeated reference to a contract in Syria and sale of fuel oil within Syria. It states PetroGulf's business plan begins with "purchas[ing], transport[ing] and sell[ing] fuel oil from Iraq initially to Syria and Kurdistan". The business plan stated, "We intend to complete delivery of 15,000 metric tons [of fuel oil] to Kurdistan by the end of December 2008 and to complete the delivery under our contract to Syria by the end of February 2009." The business plan reported on known needs for oil in Syria. It explicitly asserted PetroGulf had a contract for oil sale in Syria and offered investors 10% of the profits obtained from that contract. It stated that the purpose of the proposed arrangement with investors was to "implement an initial contract for the export of Fuel Oil from Iraq into Syria."

As a result of the meeting and the investment document, Khoury invested $400,000 in PetroGulf. Khoury obtained the money by taking out a loan from Garantia Financiera Vital y Accidentes S.A. When he was asked to whom PetroGulf should send its interest payments, Khoury said to send the payments to Garantia.

As part of the investment, the parties signed a note, and Khoury signed a subscription agreement. In the subscription agreement, Khoury acknowledged that PetroGulf had "made available to him ... the opportunity to obtain the information necessary to evaluate the merits and risks of the investment." He also represented in the subscription agreement that all of his questions had been satisfactorily answered and that he had "carefully evaluated ... the risks associated with this investment."

Khoury ultimately became dissatisfied with his investment and the lack of disclosures of PetroGulf's financial information. As a result, Khoury met with Tomlinson on January 9, 2012. During that meeting, Tomlinson agreed to personally repay Khoury the amount loaned to PetroGulf. They agreed that Tomlinson would repay the debt over a four or five year period. Khoury testified at trial that they had agreed that Tomlinson would elect whether to pay over four or five years. A week later, Khoury sent an email to Tomlinson summarizing what agreements they had made. Tomlinson replied, writing, "We are in agreement."

Tomlinson did not make any of the payments he had agreed to make. Khoury brought suit alleging breach of contract, securities violations under the Texas Securities Act,[1] and common-law fraud. In his live answer, Tomlinson asserted that any recovery for breach of contract was barred by the Statute of Frauds.

At trial, Tomlinson was asked about the Syrian contract discussed in the business plan. He admitted that he had declined the Syrian contract before he met with Khoury to solicit his investment. He also admitted that the representations about the Syrian contract "should not have been in" the business plan.

Tomlinson also acknowledged at trial that he had sent the email responding to Khoury's summary of their January 9 meeting. He claimed that his statement in the email of his being in agreement with Khoury referred to an agreement entirely different from the terms identified in the email to which he responded.

The jury found in favor of Khoury on all of his claims, awarding the same amount ($400,000) for each claim. The jury also awarded attorneys' fees. For the breach of contract claim, the jury found that Tomlinson had obligated himself to repay the investment amount to Khoury. It also found that Tomlinson breached that agreement.

After trial, Tomlinson filed a motion for judgment notwithstanding the verdict, seeking to overturn the jury's findings in favor of Khoury on each of Khoury's claims. For Khoury's breach of contract claim, Tomlinson argued that the jury's findings of liability should be overturned because the contract was barred by the Statute of Frauds and because the contract was too indefinite to be enforceable.

For his Statute of Frauds argument, Tomlinson acknowledged his email constituted a writing but argued the email was not signed. Tomlinson attached a copy of his email[2] to his motion.

---

**1.** *See* Tex. Rev. Civ. Stat. Ann. art. 581–33 (Vernon 2010).

**2.** The redactions were added by this Court. The redacted information identified the email addresses for Khoury and Tomlinson.

Subject: Re: agreement

From: Prentis Tomlinson ()

To: 

Date: Monday, January 16, 2012 8:37 AM

We are in agreement and I am working on producing the financial documents you requested. My goal is to have completed by weeks end and forward to you. Also, I had a hard time watching my home state team's miserable performance - however as a former player you must have wanted to throw up.

Sent from my iPhone

On Jan 16, 2012, at 3:47 PM, "john khoury" <> wrote:

Prentiss,
To recap our meeting in Houston on Monday January 9, 2012, I would offer the following recap.
1 You confirmed your intention to repay the $400,000 loan I made to Petrogulf, as provided for in the documents, and for which I requested, as provided for, almost 2 years ago.
2 Eddie Moses had confirmed this to me in 2011, at a luncheon, at Babin's restaurant, approximately 6 months ago.
3.You were going to make the January interest payment, as per the original schedule, when you returned to Washington, D.C.
4 I agreed to reduce the interest from 14% to 7.5% on a 4 or 5 year payout. Four years P&I payments at $9,671.56, or 5 year P&I payments of $8,015.18.
5. You were also going to redo the books and records, to more accurately reflect the last 4 years for Petro-Gulf.
Please confirm this agreement. Also, please make the regular payment for January

Thank You for honoring your word It is refreshing to know that you and I both respect this principle.

Best Regards,
John Khoury

For the Texas Securities Act claim, Tomlinson argued the trial court should disregard the jury's finding of liability and damages because the note in question was not a security, any misrepresentations he made were not material, the claim was barred by the limitations period, and there was insufficient proof of damages. The trial court granted the motion for the Texas Securities Act claim and breach of contract claim. It denied the motion for the fraud claim.

### Standard of Review

 When a motion for judgment notwithstanding the verdict is premised on the legal sufficiency of the evidence to support a claim, rulings on a motion for JNOV and directed verdict are reviewed under the same legal-sufficiency test as are appellate no-evidence challenges. *JSC Neftegas–Impex v. Citibank, N.A.*, 365 S.W.3d 387, 395 (Tex. App.–Houston [1st Dist.] 2011, pet. denied); *see also In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994) ("[Q]uestions of law are always subject to de novo review."). Such a no-evidence challenge " 'will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.' " *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Mer-*

*rell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997)).

 In our legal-sufficiency review, "we must view the evidence in a light that tends to support the finding of disputed fact and disregard all evidence and inferences to the contrary." *Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709 (Tex. 2003). With that evidence, we review "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review .... [L]egal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005).

 This case also involves questions of statutory interpretation and contract construction. We review those questions de novo. *See Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex. 2011) (statutory interpretation); *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex. 2003) (contract construction).

### Breach of Contract

In his second issue, Khoury argues the trial court erred by granting the judgment notwithstanding the verdict on his breach of contract claim. Tomlinson presented two grounds for why the jury's finding on liability should have been overturned. First, Tomlinson argued that the contract was barred by the Statute of Frauds. Second, Tomlinson argued that the contract was too indefinite to be enforceable.

### A. Statute of Frauds

"[A] promise by one person to answer for the debt ... of another person" "is not enforceable unless the promise or agree-ment, or a memorandum of it, is (1) in writing; and (2) signed by the person to be charged with the promise or agreement ...." TEX. BUS. & COM. CODE ANN. § 26.01(a)(1)–(2), (b)(2) (Vernon 2015). The parties agreed at trial that they met on January 9, 2012, and that they entered into an agreement. The evidence shows that, a week later, Khoury sent Tomlinson an email listing the terms of their agreement and requesting Tomlinson's confirmation of those terms. Tomlinson acknowledged at trial that he received the email and sent the responding email, writing, "We are in agreement."

The email shows that Tomlinson's name does not appear in the body of the email that he wrote. His name and email address do appear, however, in the "from" field for the email. The question before us is whether the name or email address in the "from" field constitutes a signature for purposes of the Statute of Frauds. *See id.* § 26.01(a)(2).

It is undisputed by the parties that their email correspondence is governed by the Texas Uniform Electronic Transactions Act ("UETA"). *See* TEX. BUS. & COM. CODE ANN. §§ 322.001–.021 (Vernon 2015). Subject to exceptions not applicable to this case, UETA "applies to electronic records and signatures relating to a transaction." *Id.* § 322.003(a). "A record or signature may not be denied legal effect or enforceability solely because it is in electronic form." *Id.* § 322.007(a). "If a law requires a signature, an electronic signature satisfies the law." *Id.* § 322.007(d). We must construe and apply UETA in a manner "to be consistent with reasonable practices concerning electronic transactions and with the continued expansion of those practices."[3] *Id.* § 322.006(2).

---

**3.** It is worth noting the history of the enactment of UETA. Before it was enacted in Tex-as, the federal government enacted E–SIGN. *See* TEX. BUS. & COM. CODE ANN. ch. 322 state bar

Under UETA, an electronic record is "a record, created, generated, sent, communicated, received, or stored by electronic means." *Id.* § 322.002(7). An electronic signature is "an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." *Id.* § 322.002(8).

An email satisfies all of the disjunctive definitions of an electronic record. *See id.* § 322.002(7). A name or email address in a "from" field is a symbol logically associated with the email. *See id.* § 322.002(8). We are left to determine, then, whether a name or email address in a "from" field can be construed to be "executed or adopted by a person with the intent to sign the record." *See id.*

While UETA defines "electronic signature," it does not define "sign." This was by design. *See* Tex. Bus. & Com. Code Ann. ch. 322 official comment (Vernon 2015) (recognizing UETA "defers to existing substantive law" for "the meaning and effect of 'sign' "). Accordingly, we look to existing law to determine the meaning and effect of "sign." *See id.*

■ "The signature of the person against whom enforcement is sought [under the Statute of Frauds] authenticates the document as reliable evidence of that person's agreement to the transaction." *Lone Star Air Sys., Ltd. v. Powers*, 401 S.W.3d 855, 859 (Tex. App.–Houston [14th Dist.] 2013, no pet.). "[F]or the purpose of the Statute of Frauds, the signature of the 'person to be charged' is the act which authenticates the document as reliable evidence of that person's agreement to the transaction." *Capital Bank v. Am. Eyewear, Inc.*, 597 S.W.2d 17, 19 (Tex. Civ. App.–Dallas 1980, no writ). "What is essential [for a signature under the Statute of Frauds] is that the signature of the party to be charged shall authenticate the whole of the writing." *Gruss v. Cummins*, 329 S.W.2d 496, 500 (Tex. Civ. App.–El Paso 1959, writ ref'd n.r.e.); *see also Betts v. Betts*, No. 14-11-00267-CV, 2012 WL 2803750, at *2 (Tex. App.–Houston [14th Dist.] July 10, 2012, pet. denied) (mem. op.) (recognizing Texas law treats documents as signed when they contain any mark sufficient to show intent to be bound by document).

■ The "from" field in the email authenticated the writing in the email to be Tomlinson's. UETA expressly allows for automated transactions to satisfy the requirements of contract formation. *See* Bus. & Com. § 322.014. The very nature of automated transactions requires the mechanisms for the transaction to be established in advance of the actual transactions. The fact that the name or email address to appear in a "from" field was set up in advance of sending the email in question, then, does not preclude any legal effect of

committee comments 1 (Vernon 2015) (noting E–SIGN was enacted in 2000). E–SIGN preempts state laws on electronic transactions unless the states adopted UETA. 15 U.S.C.A. §§ 7001(a), 7002(a) (West 2009). Any exceptions the states enact to restrict the scope of the uniform code results in E–SIGN preempting those restrictions. *Id.* § 7002(a)(1). The Texas Legislature enacted UETA with the explicit intent of superseding E–SIGN. *See* Tex. Bus. & Com. Code Ann. § 322.019 (Vernon 2015) ("This chapter modifies, limits, or supersedes the provisions of the Electronic Sig-

natures in Global and National Commerce Act (15 U.S.C. Section 7001 et seq.) as authorized by Section 102 of that Act (15 U.S.C. Section 7002)."); *see also* Tex. Bus. & Com. Code Ann. § 322.003 state bar committee comment 1 (Vernon 2015) (recognizing chapter 322 "does not contain any non-uniform exceptions to the scope of [the uniform code] and does not therefore invoke the E–SIGN consistency test for preemption."). Nothing in this opinion should be read to restrict the application of the uniform code.

the name or email address. *See also id.* § 322.006(2) (requiring UETA to be construed and applied consistently with continued expansion of practices for electronic communications); UNIF. ELEC. TRANSACTIONS ACT § 2 cmt. 7 (UNIF. LAW COMM'N 1999) (recognizing that entering in identifying information into website and later clicking "I agree" button satisfies signature requirement).

Related authority backs up the conclusion that the name or email address in a "from" field functions as a signature in an email. The New Oxford American Dictionary defines sign to mean to "write one's name . . . to identify oneself as the writer or sender." *Sign*, THE NEW OXFORD AM. DICTIONARY (2d. ed. 2005). Black's Law Dictionary defines sign as "[t]o identify (a record) by means of a signature, mark, or other symbol with the intent to authenticate it as an act or agreement of the person identifying it." *Sign*, BLACK'S LAW DICTIONARY (10th ed. 2014). The "from" field functions to identify the sender of the email and authenticate the email as his act. Legal scholarship likewise recognizes this point. *See* Douglas B. Lang, *Electronic Settlement Agreements, Are They Enforceable in Texas?*, 64 TEX. B.J. 638, 644 (2001) (arguing "from" field in an email satisfies signature requirement for electronic messages).

Finally, other states that have adopted the uniform code have reached the same conclusion. *Int'l Casings Grp., Inc. v. Premium Standard Farms, Inc.*, 358 F.Supp.2d 863, 873 (W.D. Mo. 2005) (holding email header with name of sender constitutes signature under Missouri UETA)[4]; *Kluver v. PPL Mont., LLC*, 368 Mont. 101, 293 P.3d 817, 822–23 (2012) (holding "from" field in email and statement of approval in body of email established email was signed); *Dalos v. Novaheadinc*, No. 1 CA-CV 07-0459, 2008 WL 4182996, at *3 (Az. Ct. Ap. 2008) (holding "from" field in email acted as signature); *see also* BUS. & COM. ch. 322 table of jurisdictions (identifying Missouri, Montana, and Arizona as states that have adopted the uniform code).

In his motion for rehearing, Tomlinson identifies a case from another state that he argues conflicts with our opinion. *See SN4, LLC v. Anchor Bank, fsb*, 848 N.W.2d 559, 568 (Minn. Ct. App. 2014). Despite Tomlinson's argument, the court in *SN4* held that a "from" field can constitute a signature, but did not, under the facts of the case, extend to sign an attachment to the email. *See id.* at 568–69. It also held that there was no evidence that the parties agreed to transact electronically, a legal point not at issue in this case.[5]

We recognize that the Fort Worth Court of Appeals has reached a holding in conflict with ours. In *Cunningham v. Zurich American Insurance Co.*, the court considered whether the signature line within an

---

4. Tomlinson argues in his motion for rehearing that *International Casings* has since been overruled. We disagree. In *WCT&D*, the court distinguished *International Casings* on the ground that, unlike in *WCT&D*, there was no dispute that the parties sending the emails "had authority to bind their respective companies; they testified under oath that they sent the emails at issue; and their testimony made it 'clear that [they], by hitting the send button, intended to presently authenticate and adopt the content of the e-mails as their own writing.' " *WCT & D, LLC v. City of Kansas City*, 476 S.W.3d 336, 342 (Mo. Ct. App. 2015) (quoting *Int'l Casings Group, Inc. v. Premium Standard Farms, Inc.*, 358 F.Supp.2d 863, 870, 873 & n.13 (W.D. Mo. 2005)).

5. While he referenced the requirement that parties agree to transact electronically in his motion for judgment notwithstanding the verdict, Tomlinson never asserted that this requirement was not satisfied. Instead, he only asserted there was no evidence that the email was signed.

email constituted a signature and concluded it did not. 352 S.W.3d 519, 529–30 (Tex. App.–Fort Worth 2011, pet. denied). The court held,

> There is nothing to show that the signature block was typed by Grabouski and not generated automatically by her email client. If Grabouski did personally type the signature block at the bottom of the email, nothing in the email suggests that she did so with the intention that the block be her signature, and Cunningham does not direct us to any other place in the record raising a fact issue about her intention . . . . We decline to hold that the mere sending by Grabouski of an email containing a signature block satisfies the signature requirement when no evidence suggests that the information was typed purposefully rather than generated automatically, [or] that Grabouski intended the typing of her name to be her signature . . . .

*Id.* at 530.

The court offered no explanation for why physically typing in a signature line at the time of drafting the email should be required for a "signature block" to constitute a signature. *See Cox Eng'g, Inc. v. Funston Mach. & Supply Co.*, 749 S.W.2d 508, 511 (Tex. App.–Fort Worth 1988, no writ) (holding letterhead on invoice satisfied signature requirement under Statute of Frauds).

Another court has criticized this holding. *See Williamson v. Bank of New York Mellon*, 947 F.Supp.2d 704, 710–11 (N.D. Tex. 2013). The court observed that signature blocks with a person's name are created by the account owner, not the email client. *Id.* at 710. "There is no fundamental difference between, on the one hand, manually typing a signature block into a series of emails and, on the other, typing the block once and instructing a computer program

to append it to future messages." *Id.* at 711.

The court further noted that UETA was designed to remove barriers to electronic transactions by setting an expansive view of what constitutes electronic records and signatures. *Id.* The court recognized that UETA requires the act to be construed and applied consistently with reasonable practices for electronic communications. *Id.* (citing BUS. & COM. § 322.006). "Email communication is a reasonable and legitimate means of reaching a settlement in this day and age." *Id.*

We agree. A signature block in an email performs the same authenticating function as a "from" field. Accordingly, it satisfies the requirement of a signature under UETA. *See id.*

In his motion for rehearing, Tomlinson points out that UETA requires an "*intent to sign the record.*" BUS. & COM. § 322.002(8) (emphasis added). Tomlinson argues that the intent requirement was not satisfied because, he asserts, there is proof in the record that the parties did not intend to be bound by the email. The statute does not require an intent to be *bound*, however. It requires an intent to sign. *See id.*; *see also* UNIF. ELEC. TRANSACTIONS ACT § 2 cmt. 7 (recognizing that entering in identifying information into website and later clicking "I agree" button satisfies signature requirement); *WCT & D, LLC v. City of Kansas City*, 476 S.W.3d 336, 342 (Mo. Ct. App. 2015) (holding party's admission of hitting the send button and sending emails established intent to authenticate and adopt the content of the e-mails as their own writing). We have held that signing the document is an act authenticating the document. The question is, then, whether the party attached a symbol with an intent to authenticate the document. Tomlinson testified that he sent the email

and wrote its contents. The evidence reasonably establishes, then, that Tomlinson intended to authenticate the email.

We hold that the email name or address in the "from" field satisfies the definition of a signature under existing law. *See Lone Star Air Sys.*, 401 S.W.3d at 859.

While UETA does not require an intent to be bound, the memorandum as a whole must establish that the parties did more than just agree to make a contract in the future. *See Hartford Fire Ins. Co. v. C. Springs 300, Ltd.*, 287 S.W.3d 771, 778 (Tex. App.–Houston [1st Dist.] 2009, pet. denied) (holding writing that contemplates contract or promise to be made in future does not satisfy Statute of Frauds). Here, the evidence establishes that the parties agreed to be bound by the terms described in the email. After Khoury described the essential terms of their deal in his email to Tomlinson, Tomlinson responded, saying, "We are in agreement." We hold that this language clearly and unambiguously expresses the intent to be bound by the terms of their agreement.

Accordingly, we hold that the evidence is sufficient to establish that Tomlinson signed the email and that the signed email satisfies the Statute of Frauds.

## B. Indefiniteness

Tomlinson's other ground for overturning the jury's finding of liability is that the contract was too indefinite to be enforceable. To be enforceable, an agreement must contain all of its essential terms. *See Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 238 (Tex. 2016). We construe the contract as a whole " 'to determine what purposes the parties had in mind at the time they signed' it." *Id.* at 239 (quoting *Kirby Lake Dev., Ltd. v. Clear Lake*

*City Water Auth.*, 320 S.W.3d 829, 841 (Tex. 2010)).

"Forfeitures are not favored in Texas, and contracts are construed to avoid them." *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009). "Thus, if the parties clearly intended to agree and a 'reasonably certain basis for granting a remedy' exists, we will find the contract terms definite enough to provide that remedy." *Fischer*, 479 S.W.3d at 239 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 33 cmt. b (1981)). "[T]he degree of certainty required may be affected by the dispute which arises and by the remedy sought." RESTATEMENT (SECOND) OF CONTRACTS § 33 cmt. b. "For example, when a suit seeks money damages—rather than specific performance—less certainty is needed to render a contract enforceable." *Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 751 (Tex. App.–Houston [1st Dist.] 2014, no pet.) (citing *Somers v. Aranda*, 322 S.W.3d 342, 345 (Tex. App.–El Paso 2010, no pet.)).

Here, the evidence shows that Tomlinson agreed to pay Khoury $400,000 at 7.5% interest over a period of four or five years. The estimation of payments required under either option establishes that the payments were to have been submitted monthly. Khoury testified that the parties agreed that Tomlinson would elect whether to pay over a four year period or a five year period.

Tomlinson argued to the trial court that the agreement was indefinite because it did not specify whether the loan would be repaid in four or five years. Because the parties agreed that Tomlinson would elect which time period he would prefer, this was not a term requiring further negotiation. *See Fischer*, 479 S.W.3d at 237 (holding leaving material terms open for future agreement means document is not bind-

ing).[6] We hold the contract is sufficiently certain to sustain the jury's finding of liability for breach of contract.

We hold that Tomlinson did not establish that Khoury's breach-of-contract claim failed as a matter of law or was legally insufficient. We sustain Khoury's second issue.

## Attorneys' Fees

In his third issue, Khoury argues that he is entitled to recover his attorneys' fees. A person may recover his attorneys' fees when he prevails on a breach of contract claim. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (Vernon 2015). In his motion for judgment notwithstanding the verdict, Tomlinson argued that Khoury was "legally precluded from recovering attorneys' fees because he failed to segregate his fees."

A party seeking to recover attorneys' fees must "segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). "[I]f any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Id.* at 313. To recover attorneys' fees, the plaintiff must prevail on its claim against the defendant. *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 666 (Tex. 2009). The party is not required to segregate fees between claims when discrete legal services advance both recoverable and unrecoverable claims, however. *Id.* at 313–14. Whether fees must be segregated is a mixed question of law and fact. *Id.* at 313.

Khoury's primary attorney testified at trial that he did not segregate his requested fees between recoverable and unrecoverable claims or even between parties against whom Khoury did or did not prevail. He testified that he did not segregate his fees, testifying that "there's ... a rule that says if the facts of the case are so inextricably intertwined that it's the same set of facts, the same nucleus of operative facts that gives rise to these claims," segregation is not necessary. He testified that all of Khoury's attorneys' fees fell under this category.

This is not the law, however. In an earlier case, the Supreme Court of Texas announced a rule establishing that attorneys' fees did not need to be segregated when the claims arise from the same transaction and are interrelated. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11–12 (Tex. 1991). The Supreme Court of Texas has since modified *Stewart Title* on this holding. *Chapa*, 212 S.W.3d at 314. Nevertheless, fees do not need to be segregated for discreet legal services that advance both recoverable and unrecoverable claims. *Id.* at 313–14.

Khoury asserted claims for which he could recovery attorneys' fees as well as a claim for which he could not recover attorneys' fees. He also asserted claims against parties that were later dismissed, meaning he did not prevail against those parties. *See MBM Fin. Corp.*, 292 S.W.3d at 666 (holding plaintiff must prevail against defendant in order to recover attorneys' fees). The record indicates, then, that segregation of fees would be necessary unless all of the legal services advanced all claims

---

6. To the degree Tomlinson's failure to act on his election created uncertainty in the amount of interest Khoury could have collected, this is irrelevant to our analysis because Khoury did not seek loss of interest as damages at trial.

*See Somers v. Aranda*, 322 S.W.3d 342, 345 (Tex. App.–El Paso 2010, no pet.) (holding terms about interest were not material since interest was not awarded in judgment).

and all parties. *See Chapa*, 212 S.W.3d at 313–14.

Khoury's primary attorney testified at trial that the facts underlying all of his claims were intertwined. He did not testify, however, that all of his legal services were intertwined. *See id.* Accordingly, he did not present sufficient information to support his claim that none of the attorneys' fees needed to be segregated.

■ We must remand for a new trial when a party should have segregated attorneys' fees but did not. *See id.* at 314 (holding improperly unsegregated attorneys' fees are some evidence of segregated amount and courts should remand for proper determination). Accordingly, we sustain Khoury's third issue to the degree that he argues he is entitled to his attorneys' fees. We overrule Khoury's third issue to the degree he argues he was entitled to the attorneys' fees awarded by the jury.

### Securities Act Claim

Because we are remanding for reconsideration of attorneys' fees, we must determine if Khoury prevailed on his Texas Securities Act claim in order to recover attorneys' fees for that claim. In his first issue, Khoury argues that the trial court erred by granting the judgment notwithstanding the verdict on his Texas Securities Act claim. The Texas Securities Act creates civil liability for a person who offers or sells a security by means of an untrue statement of a material fact or by means of a material, misleading omission of fact. TEX. REV. CIV. STAT. ANN. art. 581–33A(2) (Vernon 2010). In the judgment notwithstanding the verdict, Tomlinson argued that the trial court should disregard the jury's finding of liability and damages because the note in question was not a security, any misrepresentations he made were not material, the claim was barred by the limitations period, and there was insufficient proof of damages.

### A. Security

■ Tomlinson argues that the note in question is not a security under the Texas Securities Act because it is exempted as a commercial loan. "The term 'security' has been defined broadly and encompasses unusual financial instruments as well as those commonly considered securities." *Caldwell v. State*, 95 S.W.3d 563, 566 (Tex. App.–Houston [1st Dist.] 2002, pet. ref'd) (citing TEX. REV. CIV. STAT. ANN. art. 581–4A (Vernon 2015)).

In *C.S. Ltd.*, the Fourteenth Court of Appeals held that commercial loan transactions are beyond the purview of the Texas Securities Act. *C.S. Ltd. v. Nw. Mut. Life Ins. Co.*, No. 14-89-00908-CV, 1990 WL 107888, at *2 (Tex. App.–Houston [14th Dist.] July 26, 1990, writ denied) (mem. op.) (citing *Bellah v. First Nat'l Bank of Hereford, Tex.*, 495 F.2d 1109, 1113 (5th Cir. 1974)). *C.S. Ltd.* relied on *Bellah* for this holding. *Id.* (citing *Bellah*, 495 F.2d at 1113).[7]

■ *Bellah* held that a note is a commercial loan—and therefore exempt from being classified as a security—when the note is construed as commercial paper and not an investment in the enterprise. 495 F.2d at 1113. Providing a party with money or credit with an agreement to repay the amount owed under fixed terms is a commercial loan. *See id.* In contrast, if the terms of the agreement also gives the

---

7. *See Caldwell v. State*, 95 S.W.3d 563, 566 (Tex. App.–Houston [1st Dist.] 2002, pet. ref'd) ("Texas courts have looked to federal courts when interpreting the definition of 'security.' ").

lender a stake in the profitability of the enterprise, it is a security. *See id.*

Here, the note obligated PetroGulf to make fixed interest payments on the amount invested. It also, however, obligated PetroGulf to pay 10% of its net profits, distributed quarterly. The obligation to pay 10% of net profits gave Khoury a stake in the profitability of the enterprise. *See id.* Accordingly, the note in dispute cannot be classified as a commercial loan, and this cannot be a ground to support the trial court's judgment notwithstanding the verdict. *See id.*

## B. Material Misrepresentation

■ Tomlinson points out that Khoury signed a subscription agreement acknowledging that PetroGulf had "made available to him ... the opportunity to obtain the information necessary to evaluate the merits and risks of the investment." He also represented in the subscription agreement that all of his questions had been satisfactorily been answered and that he had "carefully evaluated ... the risks associated with this investment." Tomlinson argues that these acknowledgments defeat Khoury's claim that Tomlinson made material misrepresentations.

■ "A person who offers or sells a security ... by means of an untrue statement of a material fact or an omission to state a material fact [necessary to make a statement] not misleading, is liable to the person buying the security from him ...." REV. CIV. STAT. art. 581–33A(2). A purchaser of a security has no duty of due diligence to verify the veracity of a seller's claims.[8] *Summers v. WellTech, Inc.*, 935 S.W.2d 228, 234 (Tex. App.–Houston [1st Dist.] 1996, no writ); *accord In re Westcap*

*Enters.*, 230 F.3d 717, 726 (5th Cir. 2000) ("The Texas Securities Act does not require that the buyer prove his own due diligence.").

All of the admissions that Tomlinson's highlights concern whether Khoury believed he had received information from PetroGulf. They did not place any onus on Khoury to verify the veracity of Tomlinson's claims. Such acknowledgments do not defeat a claim that the seller made material misrepresentations or omissions.

■ Next, Tomlinson argues that the misrepresentations and omissions that Khoury alleged he made were not material. "For purposes of the [Texas Securities Act], an omission or misrepresentation is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding to invest." *Highland Capital Mgmt., L.P. v. Ryder Scott Co.*, 402 S.W.3d 719, 743 (Tex. App.–Houston [1st Dist.] 2012, no pet.). This is a mixed question of law and fact that is usually reserved for the trier of fact to resolve. *Id.* at 744. It can only be taken out of the hands of the trier of fact to resolve when " 'the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality.' " *Id.* (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 (3d Cir. 1992)).

One of those misrepresentations concerns a statement in the business plan presented to Khoury. The business plan stated, "We intend to complete delivery of 15,000 metric tons [of fuel oil] to Kurdistan by the end of December 2008 and to complete the delivery under our contract to Syria by the end of February 2009." Tom-

---

**8.** This applies to fraud in the inducement claims more generally as well. *See Koral Indus. v. Sec.-Conn. Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex. 1990) ("Failure to use due diligence to suspect or discover someone's fraud will not act to bar the defense of fraud to the contract.").

linson admitted that he had declined the Syrian contract before his meeting with Khoury and that this representation "should not have been in" the business plan.

Khoury argued in his motion that this representation was actually true. He argues that the contract did, in fact, exist. "Accordingly, Khoury has no evidence that the Syrian contract did not exist when he met with Tomlinson, only that the pricing had changed and that no fuel was being lifted at the current pricing under that contract." Tomlinson provides no explanation for how this is not a misrepresentation of a plan to complete delivery under the contract to Syria by the following February.

The business plan made repeated reference to a contract in Syria and sale of fuel oil within Syria. It stated that PetroGulf's business plan begins with "purchas[ing], transport[ing] and sell[ing] fuel oil from Iraq initially to Syria and Kurdistan." The business plan reported on known needs for oil in Syria. It explicitly asserted that PetroGulf had a contract for oil sales in Syria and offered investors 10% of the profits obtained from that contract. It stated that the purpose of proposed arrangement with investors was to "implement an initial contract for the export of Fuel Oil from Iraq into Syria."

The repeated reference in the business plan to a Syrian contract and plans to sell fuel oil into Syria, together with Tomlinson's acknowledgement that he knew the contract was not profitable created at least a fact issue on whether Tomlinson's representations about the Syrian contract were material. *See id.* at 743–44. Accordingly, this cannot be a ground to support the trial court's judgment notwithstanding the verdict.

## C. Limitations

 Tomlinson points out that the limitations period for Khoury's suit was within "three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence." REV. CIV. STAT. art. 581–33H(2)(a). Tomlinson argues that the evidence shows that Khoury failed to prove that he timely filed suit. Khoury argues that it was not his burden and that Tomlinson failed to raise the issue as an affirmative defense. We agree with Khoury.

 It is an affirmative defense to assert that a claim is barred by the statute of limitations. TEX. R. CIV. P. 94. "The defendant thus bears the initial burden to plead, prove, and secure findings to sustain its plea of limitations." *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988). "A party waives the affirmative defense of statute of limitations if it is not pleaded or tried by consent." *Frazier v. Havens*, 102 S.W.3d 406, 411 (Tex. App.–Houston [14th Dist.] 2003, no pet.).

Tomlinson did not plead the application of the statute of limitations as an affirmative defense. Nor did he attempt to secure a ruling on it until his motion for judgment notwithstanding the verdict. Accordingly, the issue was waived. *See id.*

Tomlinson relies on an Austin Court of Appeals case to argue that Khoury had the burden of proof that he timely filed suit. *See Shields v. State*, 27 S.W.3d 267, 275 (Tex. App.–Austin 2000, no pet.). In *Shields*, the Austin Court of Appeals reasoned that the limitations period laid out in article 581–33 under the heading "Statute of Limitations" was not, in fact, a statute of limitations. *Id.* Instead, the court reasoned that the time period was "an element of the statutory cause of action itself." *Id.*

The court asserted that, when a statute creates both a cause of action and a time limit for bringing the claim, the time limit becomes an element of the cause of action. *See id.* Its authority for this assertion was a case from the Supreme Court of Texas. *Id.* (citing *California v. Copus*, 158 Tex. 196, 309 S.W.2d 227, 231 (1958)).

There is no such holding in *Copus.* Instead, *Copus* acknowledged that a secondary authority had urged the application of a rule that a statutory time limit on a statutory cause of action became an element of the cause of action. 309 S.W.2d at 231. The court itself acknowledged that "there exists quite a cleavage among the authorities as to the validity of this exception." *Id.* The court then declined to adopt this rule and reached its conclusion by adopting a different proposition of law. *See id.* at 231–32 (holding limitations period for cause of action is substantive law, not procedural, and must be applied by forum in which suit is brought).

We decline to adopt the holding in *Shields.* The limitations period for a Texas Securities Act claim is a statute of limitations. *See Arnold v. Life Partners, Inc.*, 416 S.W.3d 577, 589 (Tex. App.–Dallas 2013), *aff'd*, 464 S.W.3d 660 (Tex. 2015) (treating limitations period under act as statute of limitations); *Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 404 (Tex. App.–Houston [1st Dist.] 2012, remand by agreement[9]) (same). Accordingly, because Tomlinson waived any application of this affirmative defense, it cannot be a ground to support the trial court's judgment notwithstanding the verdict.

## D. Damages

■ Tomlinson argued in his motion that Khoury did not suffer any damages because the note was payable to Garantia. The evidence shows that Khoury gave PetroGulf $400,000. The evidence also shows that the $400,000 came from a loan that Khoury obtained from Garantia. Khoury testified that, when asked to whom PetroGulf should send its interest payments, he said to send the payments to Garantia. He testified that, if PetroGulf had sent the interest payments to him, he would have had to send the money to Garantia to pay the interest on his loan. So sending the money directly to Garantia was easiest. Because there is some evidence to support the jury's determination that Khoury, not Garantia, suffered damages, this cannot be a ground to support the trial court's judgment notwithstanding the verdict.

■ Next, Tomlinson argued that Khoury used an incorrect damages model and that, accordingly, the damages were not proved. The Texas Securities Act provides a number of methods for calculating damages or rescission value. *See* Rev. Civ. Stat. art. 581–33D. Tomlinson argues that Khoury should have used the model for calculating damages when a buyer has previously disposed of the security. *See id.* art. 581–33D(3). Tomlinson points to no evidence showing that Khoury disposed of the security before trial. This cannot be the correct measure for damages, then. Accordingly, this cannot be a ground to support the trial court's judgment notwithstanding the verdict.

We sustain Khoury's first issue.[10]

---

**9.** In *Allen,* we withdrew the judgment but denied the parties' motion to · withdraw the opinion. *See Allen v. Devon Energy Holdings, L.L.C.,* No. 01-09-00643-CV, 2013 WL 273026, at *1 (Tex. App.–Houston [1st Dist.] Jan. 24, 2013, no pet.).

**10.** We do not need to reach Tomlinson's issues on cross-appeal concerning Khoury's common-law fraud claim because our holdings in this opinion support the jury's verdict. *See* Tex. R. App. P. 47.1; *Romero v. Kroger Tex., L.P.,* No. 01-12-00049-CV, 2013 WL 6405477,

## Conclusion

We reverse the trial court's grant of Tomlinson's judgment notwithstanding the verdict for Khoury's breach of contract and Texas Securities Act claims and remand for a new trial on attorneys' fees.

at *4 (Tex. App.–Houston [1st Dist.] Dec. 5, 2013, no pet.) (mem. op.),