**REVERSE AND RENDER; Opinion Filed July 1, 2024**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-24-00121-CV**

**FLARB, LLC, Appellant**
**V.**
**NICKELS AND DIMES INCORPORATED, Appellee**

**On Appeal from the 416th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 416-03367-2023**

# MEMORANDUM OPINION

Before Justices Molberg, Nowell, and Kennedy
Opinion by Justice Kennedy

In this accelerated appeal, FLARB, LLC appeals from the trial court's interlocutory order denying its special appearance. In its first issue, appellant argues the trial court's denial was error because the only bases for jurisdiction were the choice-of-venue and jurisdiction provisions in a settlement agreement not actually entered into by either party due to failure of a required condition precedent to contract formation. In its second issue, appellant urges the trial court erred by failing to admit evidence probative of the fact that neither party actually entered into the agreement. We reverse the trial court's order denying appellant's special appearance

and render judgment dismissing all claims against appellant for lack of personal jurisdiction. Because all dispositive issues are settled in law, we issue this memorandum opinion. *See* TEX. R. APP. P. 47.2(a), 47.4.

## BACKGROUND

Appellant is a limited liability company incorporated in California with a principal place of business located in California. On July 20, 2018, appellant filed a trademark application with the United States Patent and Trademark Office for the word mark "DEMON'S TILT" for use in computer game software. Soon thereafter, appellant announced it was publishing and co-developing a game called DEMON'S TILT, a pinball-style computer game.

On July 22, 2021, appellee, a Texas corporation with its principal business office located in Texas, sent appellant a demand letter alleging unauthorized use of appellee's trademark, TILT. Appellee represented that its TILT trademark is registered in connection with providing amusement arcade game facility entertainment services and that there could be a likelihood of confusion between TILT and DEMON'S TILT. Appellant responded, denying any likelihood of confusion. On October 5, 2021, appellee commenced proceedings to cancel appellant's federal trademark registration for DEMON'S TILT.

In December 2022, the parties began settlement negotiations to resolve the trademark dispute. Those negotiations continued through 2023, with several email communications and multiple drafts exchanged throughout the process:[1]

- On February 24, appellant's counsel emailed proposed terms for a settlement agreement: "(1) [appellant] pays [appellee] $15,000; (2) [appellant] agrees not to use any mark containing the "TILT" term for a retail/brick and mortar entertainment venue; and [t]he parties agree to standard co-existence terms — cooperate in the case of actual confusion, etc."

- On February 27, appellee's counsel emailed that appellee "accepts those material terms," suggested suspending the cancellation proceeding "for 30 days to finalize a settlement agreement, and proposed he circulate the first draft."

- On March 3, appellant's counsel emailed that his client had reviewed and made some modifications and requested appellee's counsel "review and confirm your approval."

- On March 6, appellee's counsel emailed a response to "accept [the changes] and send me a signed copy of the Agreement for my client to countersign."

- On March 13 and 20, appellee's counsel emailed appellant's counsel asking, "When can I expect the signed agreement from you?"

- Later on March 20, appellant's counsel emailed, stating that attached was a signed agreement with "some small changes," including changing the governing law and jurisdiction to the state of California, instead of Texas.

- That same day, appellee's counsel responded, "On March 6th, we accepted your client's counteroffer," "[a]s of that date, we had an agreement," and that appellee rejected appellant's proposed change to the governing law and jurisdiction provision.

---

[1] Copies of these email communications were attached as exhibits to appellee's petition.

On June 28, 2023, appellee filed the underlying breach-of-contract suit against appellant, alleging the parties had reached a settlement agreement on March 6, 2023 (March 6 Agreement), that appellant had refused to perform its obligations under the March 6 Agreement, and that appellant had repudiated the March 6 Agreement by submitting to appellee a new proposed agreement with terms differing from the March 6 Agreement. In its petition, appellee alleged, "This Court has personal jurisdiction over Defendant because, as more specifically alleged below, the Parties entered into an agreement and in Paragraph 9(b) the Parties consented to personal jurisdiction in the state of Texas to resolve any and all disputes arising out of their agreement."

On November 11, 2023, appellant filed its special appearance and answer subject thereto. In that special appearance, appellant asserted the parties "never fully executed a settlement where all terms were agreed by both sides." Additionally, appellant denied being a Texas resident, having minimum contacts with Texas, or consenting to Texas jurisdiction and urged that appellee failed to plead appellant committed an act in Texas or that appellant's acts outside Texas had reasonably foreseeable consequences in Texas. Appellant also argued exercise of jurisdiction over it would offend the traditional notions of fair play and substantial justice. Attached as support to the special appearance were the affidavits of appellant's chief executive officer Ralph Barbagallo and its counsel Anton N. Handal. According to Barbagallo, negotiations continued after the March 20 email exchange, including

–4–

additional drafts exchanged and rejected, but appellant did not agree to or sign any proposed agreement in which it consented to jurisdiction in Texas. Handal's affidavit included similar statements that negotiation discussions continued after March 20 and that the parties continued to exchange drafts, but that appellant never agreed to or signed any agreement to consent to jurisdiction in Texas.

Appellee responded to appellant's special appearance with a declaration from its counsel Bradley J. Walz and several evidentiary exhibits attached thereto, including emails between himself and Handal. According to Walz, on March 27, he had a phone conference with Handal, during which he asserted the parties had a contract, but that appellee would discuss amending the Agreement. Appellant filed a reply. On January 18, 2024, the trial court conducted a non-evidentiary hearing on the special appearance motion, and on February 12, the trial judge signed an order overruling appellant's special appearance. This appeal followed.

## DISCUSSION

In its first issue, appellant argues the trial court's ruling denying its special appearance was error because the only bases for jurisdiction were the choice-of-venue and consent-to-jurisdiction provisions in a settlement agreement not actually entered into by either party due to failure of a required condition precedent to contract formation.

A court may assert personal jurisdiction over a nonresident defendant only if the Texas long-arm statute and due process requirements of the Fourteenth

Amendment to the United States Constitution are satisfied. *Boyer v. Mode Transp., LLC*, No. 05-23-00008-CV, 2023 WL 6457442, at *2 (Tex. App.—Dallas Oct. 4, 2023, no pet.) (mem. op.) (citing U.S. CONST. amend. XIV, § 1; TEX. CIV. PRAC. & REM. CODE § 17.042 (Texas long-arm statute); *LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341, 346 (Tex. 2023)). The Texas long-arm statute allows Texas courts to exercise personal jurisdiction over a nonresident defendant who is doing "business in this state" and "commits a tort in whole or in part in this state." CIV. PRAC. & REM. § 17.042(2). Due process is satisfied when the nonresident defendant has established minimum contacts with the forum state and the exercise of jurisdiction over the nonresident defendant comports with traditional notions of fair play and substantial justice. *See Boyer*, 2023 WL 6457442, at *2 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945); *LG Chem Am., Inc.*, 670 S.W.3d at 346).

In a challenge to personal jurisdiction, the plaintiff and the defendant bear shifting burdens of proof. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018) (citing *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010)). The plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute. *Id.* (citing *Kelly*, 301 S.W.3d at 658). Once it has done so, the burden shifts to the defendant to negate all bases of personal jurisdiction alleged by the plaintiff. *Id.* (citing *Kelly*, 301 S.W.3d at 658).

Objections to personal jurisdiction may be waived, so a litigant may consent to the personal jurisdiction of a court through a variety of legal arrangements. *In re Fisher*, 433 S.W.3d 523, 532 (Tex. 2014) (orig. proceeding) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n. 14 (1985)). A contractual "consent-to-jurisdiction clause" subjects a party to personal jurisdiction, making an analysis of that party's contacts with the forum for personal jurisdiction purposes unnecessary. *See id.* (citing *RSR Corp. v. Siegmund*, 309 S.W.3d 686, 704 (Tex. App.—Dallas 2010, no pet.) (concluding a contract provision that claims "may be heard" in Dallas courts was a "consent-to-jurisdiction" clause and trial court erred by granting defendant's special appearance)) (other citations omitted)).

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law that we review de novo. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018) (citing *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013)). When we review a trial court's order denying a special appearance, we review the court's factual findings for legal and factual sufficiency and its legal conclusions de novo. *CNOOC Se. Asia Ltd. v. Paladin Res. (SUNDA) Ltd.*, 222 S.W.3d 889, 894 (Tex. App.—Dallas 2007, pet. denied) (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793–94 (Tex. 2002); *A & J Printing, Inc. v. DSP Enters., L.L.C.*, 153 S.W.3d 676, 680 (Tex. App.—Dallas 2004, no pet.)). When a trial court does not issue findings of fact and conclusions

of law, we must imply all findings of fact necessary to support the judgment if they are supported by the evidence. *Id.* (citing *BMC Software*, 83 S.W.3d at 795).

Here, the trial court did not issue findings of fact and conclusions of law. Consequently, by denying the special appearance, the court impliedly found that the forum-selection clause in the March 6 Agreement was valid and enforceable. We review the validity and enforceability of a forum-selection clause under an abuse of discretion standard. *CNOOC Se. Asia Ltd.*, 222 S.W.3d at 894 (citing *My Cafe–CCC, Ltd. v. Lunchstop, Inc.*, 107 S.W.3d 860, 864 (Tex. App.—Dallas 2003, no pet.); *Phoenix Network Techs. v. Neon Sys.*, 177 S.W.3d 605, 610 (Tex. App.—Houston [1st Dist.] 2005, no pet.)).

Appellant contends the forum-selection clause was not enforceable for two reasons: (1) language in the March 6 Agreement and correspondence between the parties' counsel showed the parties' intent to be bound only upon signing and appellant never signed, and (2) the March 6 Agreement includes a consideration provision that required appellant to deposit $15,000 and that because appellant did not do so, the contract's formation was prevented.

"Texas law recognizes that a contract need not be signed to be 'executed' unless the parties explicitly require signatures as a condition of mutual assent." *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 277 (Tex. 2015) (citations omitted). Where parties to a written contract intend that it shall not be binding until it is signed by the parties, the signatures of both parties are required to give effect to

–8–

the contract. *See New York Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206, 214 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (citing *Simmons & Simmons Constr. Co. v. Rea*, 286 S.W.2d 415, 418–19 (1955); *Birchminster Res. v. Corpus Christi Mgmt. Co.*, 517 S.W.2d 608, 611 (Tex. App.—Corpus Christi 1974, writ dism'd)). Therefore, "the question of whether a written contract must be signed to be binding is a question of the parties' intent." *Id.* (quoting *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004, no pet.).[2]

Courts have reviewed evidence from the written instrument purporting to be a contract as well as the parties' communication and conduct to determine the parties' intent. For example, the Texas Supreme Court concluded the following evidence supports that the parties intended for the written contract to be signed in order to be binding: the written instrument provided places for the signatures of both parties, required the signatures of both parties in connection with the furnishing of a performance bond, and was delivered with specific instructions to sign it. *See Simmons*, 286 S.W.2d at 418–19. Likewise, the Houston Court of Appeals

---

[2] Additionally, the Texas statute of frauds requires certain promises or agreements to be in writing and "signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him." *See* TEX. BUS. & COM. CODE § 26.01(a). Appellant urges the March 6 Agreement falls within the statute of frauds because the terms were "not to be performed within one year from the date of making the agreement. *See id.* § 26.01(b)(6). Appellee responds that the statute of frauds is an affirmative defense appellant has waived by failing to plead or otherwise raise in the trial court proceedings. However, Rule 120a provides that a challenge to personal jurisdiction "shall be heard and determined before . . . any other plea or pleading may be heard" and that "[n]o determination of any issue of fact in connection with the objection to jurisdiction is a determination of the merits of the case or any aspect thereof." TEX. R. CIV. P. 120a(2). Because we conclude *infra* that the parties intended for the March 6 Agreement to be signed by the parties to be enforceable, we need not decide whether appellant waived any argument regarding applicability of the statute of frauds to the March 6 Agreement. *See* TEX. R. APP. P. 47.1, 47.4.

considered language in the settlement agreement that it could not be "modified or amended except by an instrument in writing *signed by all of the Parties* hereto" to demonstrate that both parties intended signatures to be a condition precedent to a valid, new agreement and thus the evidence was legally sufficient to support the trial court's finding that signatures were required before a new agreement was formed and appellant failed to conclusively establish its affirmative defense of novation. *Bilello*, 414 S.W.3d at 214; *see also In re Bunzl USA, Inc.*, 155 S.W.3d at 210 (holding provision requiring modification or amendment of agreement to be in writing and signed by the parties as well as the signature block was evidence the parties did not intend to be bound until both parties signed the agreement).

As evidence the March 6 Agreement required signatures as a condition of mutual assent, appellant points to the following:

- The Authority to Execute Agreement provision: "By signing below, each Party warrants and represents that the person signing this Agreement on its behalf has authority to bind that Party and that the Party's execution of this Agreement is not in violation of any By-law, Covenant and/or other restrictions placed upon them by their respective entities";

- The Entire Agreement provision, which states in part that "no modification of this Agreement shall be binding unless in writing and signed by each of the Parties"; and

- The signature blocks for each party at the end of the March 6 Agreement.

Appellant also relies on a March 2 email from appellee's attorney in which Walz instructs Handal to "have your client sign and return an executed copy of the

agreement to me," which was attached as an exhibit to the special appearance. Appellant additionally cites emails dated March 6, 13, and 20, in which Waltz directs Handal on March 6 to "send me a signed copy of the Agreement for my client to countersign" and on March 13 and 20 asks, "When can I expect the signed agreement from you?" These three emails were attached to appellee's petition as well as to appellee's response to the special appearance.[3]

We conclude the foregoing evidence supports a finding that the parties intended for the March 6 Agreement to be signed in order to be binding. We now address appellee's response to appellant's issue, specifically that no physical signature was required and that instead the emails between the parties' counsel were sufficient to satisfy the signature requirement of the March 6 Agreement. Appellee relies in part on a Counterparts provision in the March 6 Agreement, which provides for electronic signatures:

> This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original, and such counterparts will together constitute one and the same instrument. The Parties agree that this Agreement may be signed electronically pursuant to the ESIGN Act, and agree that the electronic signatures appearing on this Agreement are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility.

---

[3] In its second issue, appellant challenges the trial court's ruling to exclude certain exhibits it attempted to introduce at the hearing: emails from Walz dated March 2 and June 7 and 8. Appellee objected to the March 2 email exhibit as "coming at such a late moment," and the trial court did not rule. When appellant attempted to introduce the June 7 and 8 emails as its second and third exhibits, appellee again objected. The trial court judge ultimately stated, "I don't find these to be relevant because your issue is decided well before then so I am happy to return them to you and not have them admitted but—I think your problem is back on the 6th." Accordingly, it is unclear that the judge was excluding the March 2 email at all.

Appellee also relies on the following March 3 email from appellant's counsel to appellee's counsel:

> Bradley.  Thank you for this.  My client has reviewed and I have made some modifications that should not present a problem.  At most they tighten up things.  I also need at least 14 days to make the payment.
>
> Please review and confirm your approval.

According to appellee, this email "constituted an electronic form of their contract that was electronically signed."  Appellee then points to the March 6 email as evidence of its electronic signature:

> Tony:
>
> These changes are fine. Please accept them and send me a signed copy of the Agreement for my client to countersign.[4]
>
> Thanks for working with us to get this one resolved.

Additionally, appellee cites decisions holding signature blocks and typed names in emails can provide signatures necessary for an enforceable contract.  *See*, *Williamson v. Bank of New York Mellon*, 947 F. Supp. 2d 704, 711 (N.D. Tex. 2013) (making an *Eerie* guess that a manually typed name on an email or an automatically attached signature block to an email constitutes an electronic signature); *Perdido Props. LLC on Behalf of Bremer v. Devon Energy Prod. Co., L.P.*, 669 S.W.3d 535, 561 (Tex. App.—Eastland 2023, pet. filed) (holding "either a typed name or a signature block at the end of an email is sufficient to constitute a signature"); *Khoury*

---

[4] At the hearing on appellant's special appearance, appellee represented this statement was "memorializing and trying to avoid this very dispute about whether or not there is an agreement or not."

*v. Tomlinson*, 518 S.W.3d 568, 579 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (holding "that the email name or address in the 'from' field satisfies the definition of a signature under existing law"). However, we conclude these decisions are distinguishable as they each determine that an email constitutes a signature in the context of different issues than the one presented here: whether parties intended to bind themselves through email exchanges. *See Williamson*, 947 F. Supp. 2d at 711 (whether typed name or email signature block satisfied requirements of Rule 11 of the Texas Rules of Civil Procedure, which requires agreements between attorneys or parties "touching any suit pending" to be in writing, signed and filed as part of the record to be enforceable); *Perdido*, 669 S.W.3d at 559–60 (whether acknowledgement of debt was in writing and signed by party to be charged such that limitations could be avoided); *Khoury*, 518 S.W.3d at 575 (whether email from promisee satisfied writing and signature requirement of statute of frauds as codified in section 26.01 of the business and commerce code). Additionally, at least one Texas court has held that where there was nothing to show the signature block was typed by the sender and not generated automatically by her email client or that the sender intended the block to be the sender's signature, such evidence was insufficient to meet the written signature requirements of Rule 11. *See Cunningham v. Zurich Am. Ins. Co.*, 352 S.W.3d 519, 530 (Tex. App.—Fort Worth 2011, pet. denied).

Moreover, we conclude appellee's arguments that the emails could be read as satisfying the signature requirement of the March 6 Agreement to be irreconcilable with the terms of the agreement. The Counterparts provision in the March 6 Agreement, which provides for electronic signatures, states that the parties "agree that the electronic signatures ***appearing on this Agreement*** are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility." (emphasis added). Thus, we conclude the parties intended that the signatures must be on the March 6 Agreement rather than a separate instrument or writing.

As for appellee's argument that the emails themselves could be "counterparts" to the March 6 Agreement such that the signatures could "appear" on them, we disagree. The provision states the March 6 Agreement "may be executed in one or more counterparts, each of which will be deemed to be an original, and such counterparts will together constitute one and the same instrument." Such language is similar to that used as an example in the second part of the definition of counterpart in Black's Law Dictionary: "One of two or more copies or duplicates of a legal instrument <this lease may be executed in any number of counterparts, each of which is considered an original>." *Counterpart*, BLACK'S LAW DICTIONARY (11th ed. 2019).[5] Additionally, the word "counterpart" appears in the definition of "duplicate"

---

[5] The first part of the definition reads, "In conveyancing, a corresponding part of an instrument <the other half of the indenture — the counterpart — could not be found>." *Counterpart*, BLACK'S LAW DICTIONARY (11th ed. 2019).

–14–

under Rule 1001 of the Texas Rules of Evidence. *See* TEX. R. EVID. 1001(e) ("A 'duplicate' means a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original."). Therefore, we conclude the parties did not intend for the emails here to be counterparts sufficient to satisfy the signature requirement of the March 6 Agreement.

After considering the language of the March 6 Agreement and the evidence considered by the trial court, we conclude the evidence is legally and factually insufficient to support an implied finding that the parties intended to be bound by their emails relating to the March 6 Agreement and thus executed the March 6 Agreement. Accordingly, we further conclude the trial court erred in enforcing the consent-to-jurisdiction provision within the March 6 Agreement. As no other basis for asserting personal jurisdiction over appellant was presented or argued to the trial court, we conclude the trial court erred by denying appellant's special appearance.

We sustain appellant's first issue. Having so resolved appellant's first issue, we need not address the second issue regarding whether the trial court erred by excluding appellant's exhibits at the special appearance hearing. *See* TEX. R. APP. P. 47.1, 47.4.

## CONCLUSION

We reverse the trial court's order denying appellant's special appearance and render judgment dismissing all claims against appellant for lack of personal jurisdiction.

/Nancy Kennedy/
NANCY KENNEDY
JUSTICE

240121F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

FLARB, LLC, Appellant

No. 05-24-00121-CV          V.

NICKELS AND DIMES
INCORPORATED, Appellee

On Appeal from the 416th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 416-03367-2023.

Opinion delivered by Justice
Kennedy. Justices Molberg and
Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that:

We reverse the trial court's order denying appellant's special appearance and render judgment dismissing all claims against appellant for lack of personal jurisdiction.

It is **ORDERED** that appellant FLARB, LLC recover its costs of this appeal from appellee NICKELS AND DIMES INCORPORATED.

Judgment entered this 1st day of July 2024.